IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| JODY KING,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>IC GROUP, INC.,<br><br>　　　　　Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:21-cv-00768-RJS-CMR<br><br>Chief District Judge Robert J. Shelby<br><br>Magistrate Judge Cecilia M. Romero |

Plaintiff Jody King filed this action against her former employer, Defendant IC Group, Inc. (ICG), alleging it interfered with her right to leave under the Family and Medical Leave Act (FMLA); failed to accommodate her disabilities as required by the Americans with Disabilities Act (ADA); harassed her and discriminated against her; and retaliated against her for engaging in protected activities.[1]  Now before the court is ICG's Motion for Summary Judgment in which ICG seeks a ruling King "cannot establish a causal connection between [ICG's] actions and either a protected status or activity."[2]  For the reasons discussed below, ICG's Motion is GRANTED IN PART and DENIED IN PART.

## BACKGROUND

At summary judgment, the court reviews the parties' agreed-upon factual record and draws all reasonable inferences therefrom in favor of King, the nonmovant.[3]  The following facts

---

[1] *See* Dkt. 3, *Amended Complaint* at 3; Dkt. 3-8, *Exhibit H to Amended Complaint: Causes of Action*.

[2] *See* Dkt. 46, *ICG's Motion for Summary Judgment* at 2.

[3] *See Doe v. City of Albuquerque*, 667 F.3d 1111, 1122 (10th Cir. 2012).

are drawn from the parties' summary judgment briefing and attached affidavits and exhibits.[4]
The facts are not genuinely in dispute, unless otherwise indicated.[5]

 ICG is a Utah-based printing company providing services to commercial customers ranging from healthcare companies to fast food restaurants.[6]  These customer relationships are managed by sales representatives who work as salaried or commission-based employees and handle their own customer accounts.[7]  According to ICG, "[s]ales representatives typically stay on a salary-based plan for two years or less."[8]  However, "once their sales revenue hits at least $700,000 annually," they generally "switch to [a] straight commission plan . . . because, at [ten] percent commission, they can earn more money" that way.[9]  King argues ICG's statement, with its use of 'typically' and 'generally,' evinces "a lack of clear, consistent policies . . . leaving room for [it] to manipulate [its] terms to [its] advantage . . . [and] disadvantage King."[10]  However, King does not otherwise challenge the veracity of ICG's statement.[11]

---

[4] *See* Fed. R. Civ. P. 56(c); 28 U.S.C. § 1746; *see also Vazirabadi v. Denver Health and Hosp. Auth.*, 782 F. App'x 681, 687–88 (10th Cir. 2019).

[5] The parties present numerous factual disputes in their respective briefs. See Dkt. 50, *King's Opposition to ICG's Motion for Summary Judgment* at 4–14; Dkt. 54 *ICG's Reply in Support of Its Motion for Summary Judgment* at 1-4. To the extent disputed facts are relevant to the parties' arguments at summary judgment, the court resolves those disputes herein as they arise.  Genuine disputes of material fact are stated as such.  In evaluating the parties' factual disputes, the court is mindful that conclusory allegations without supporting evidence do not raise genuine issues of material fact, particularly when contradicted by other evidence in the record.  *Metzler v. Fed. Home Loan Bank of Topeka*, 464 F.3d 1164, 1178 (10th Cir. 2006).  Additionally, the court refrains from making any judgment on factual disputes immaterial to resolving ICG's summary judgment motions.

[6] *Motion for Summary Judgment* at 2–3.

[7] *Id.* at 3; Dkt. 46-1, *Exhibit A to ICG's Motion for Summary Judgment: Ryan Kerekes Declaration* ¶ 4.

[8] *Motion for Summary Judgment* at 4.

[9] *Motion for Summary Judgment* at 3.

[10] *Opposition* at 5.

[11] The court addresses King's argument about the "inherent ambiguity" of ICG's stated policy further below.

King was an experienced sales professional when ICG hired her as a sales representative on March 20, 2018.[12]  King "represented that she was an accomplished sales executive with over [twenty] years of proven success" and averaged over $1 million in annual sales when she was at a competing printing company, Sun Print Solutions.[13]  ICG's employment offer contemplated an annual salary of $70,000 for a fixed term of twelve months, "extendable for an additional [twelve] months subject to satisfactory sales activity . . . , which [would] be discussed and reviewed [every six] months."[14]  However, "[w]hen agreed upon by the parties," the offer provided that King's "compensation [would] switch from salaried to commission."[15]  ICG maintains this arrangement "provide[d] King with a two-year ramp up period so she could build her book of business and sales numbers" while still receiving a reliable monthly salary.[16]  After that point, ICG "would switch King to a regular, straight commission compensation plan, which is the same plan for all ICG sales representatives."[17]

King disputes her offered plan "is the same plan for all ICG sales representatives."[18]  In support of her contention, King presents a commission plan for Scott Maxfield, another sales representative.  In reviewing these two agreements, which are dated two years apart, the court notes many of the substantive terms of the agreements are the same, e.g., commission percentages, benefits, reimbursements, and so forth.  However, the monthly draws against the

---

[12] *Id.*; Dkt. 46-3, *Exhibit C to ICG's Motion for Summary Judgment: 2021 King Deposition* at 49:15–50:20.

[13] *Motion for Summary Judgment* at 4; Dkt. 46-2, *Exhibit B to ICG's Motion for Summary Judgment: Dave Loach Declaration* ¶ 7; *see also 2021 King Deposition* at 54:20–24, 55:8–10 (reflecting King's stated belief that her sales at Sun Print regularly exceeded $2 million annually).

[14] *Loach Declaration* at 12 (*Exhibit 1: King's 2018 Compensation Plan*).

[15] *Id.*

[16] *Motion for Summary Judgment* at 5; *Loach Declaration* ¶ 10; *2021 King Deposition* at 143:16–146:4 (reflecting King's understanding of the terms of her 2018 compensation agreement).

[17] *Motion for Summary Judgment* at 5 (citing *Loach Declaration* ¶ 10; *2021 King Deposition* at 144:12–14).

[18] *Opposition* at 6.

commissions are different – with King's monthly draw set at $1,000 per month and Maxfield's set at $5,850.  Additionally, King's compensation agreement contemplates quarterly reviews, while Maxfield's states they occur every six months.[19]

The record contains relatively few details about the first twenty months of King's employment at ICG.[20]  King maintains she brought numerous high-value customers from her former employer, Sun Print,[21] and "received favorable performance evaluations" from her hiring manager, Chief Marketing Officer David Loach.[22]  By late 2019, however, King "asked for help and assistance due to lack of training" and was experiencing "ongoing challenges . . . with the order process and poor communication."[23]  ICG notes "King's sales never reached the [expected] $750,000 threshold during her entire employment at ICG,"[24] despite efforts to provide her "with over [eighty-five] percent of [] new account opportunities" and to assign her customers from other sales representatives.[25]

### December 11, 2019 Customer Incident

The first concrete signs of trouble between King and ICG appeared on the morning of December 11, 2019, when Loach encountered a dissatisfied customer at the ICG office who was "furious because his order was not ready."[26]  According to Loach, the customer told him he "was scheduled to meet King, but she cancelled that morning after he had already driven down from

---

[19] *Compare Kerekes Declaration* at 94, *with* Dkt. 50-8, *Exhibit 7 to King's Opposition: Scott Maxfield Agreement*.

[20] *See generally Motion for Summary Judgment* at 2–6.

[21] *2021 King Deposition* at 56:3–16.

[22] *See Amended Complaint: Causes of Action* at 2.

[23] *Kerekes Declaration* at 15 (*Exhibit 1: December 16, 2020 Email from King to Kerekes*).

[24] *Motion for Summary Judgment* at 6.

[25] *See id.*; *2021 King Deposition* at 151:23–152:4; *Loach Declaration* ¶¶ 13–15.

[26] *See Motion for Summary Judgment* at 7; *Loach Declaration* ¶ 16.

Ogden to ICG to meet with her and pick up his order."[27]  King contends she texted the client forty minutes before the scheduled meeting seeking to reschedule the meeting for later the same day, but she does not dispute she did not meet with the client as originally scheduled.[28]  Loach called King, who answered the phone "sobbing," explaining her "mom [was] not doing well."[29]  In response, Loach told her to go "take care of [her] mom" and he would handle the difficult customer situation.[30]  After getting off the phone with King, Loach "assure[d] the customer that [ICG] would make things right and told him another sales representative . . . would assist him with his promotional products orders."[31]  Loach then sent King an email letting her know another sales representative was "handling the account," before leaving the office on an international vacation.[32]

### King's December 16, 2019 Formal Grievance

A few days later, on December 16, 2019, King wrote a lengthy email to Ryan Kerekes, ICG's Chief Financial and Human Resources Officer, with a formal grievance.[33]  She explained the circumstances of her missed December 11, 2019 meeting with the customer and claimed the customer's order was untimely "due to circumstances beyond [her] control."[34]  King also expressed concern she was being "discriminated against because of [her] gender, age and disability," noting the customer's account was "reassigned to [someone] . . . younger than [her],

---

[27] *Loach Declaration* ¶ 16.

[28] *2021 King Deposition* at 157:6–17.

[29] *Loach Declaration*  ¶ 17; *see also 2021 King Deposition* at 158:14–24.

[30] *Motion for Summary Judgment* at 7 (citing *2021 King Deposition* at 161:2–18; *Loach Declaration* ¶ 17).

[31] *Loach Declaration* ¶ 19.

[32] *Id.*; *see also id.* at 15 (*Exhibit 2: December 11, 2019 Email from Loach to King*).

[33] *Kerekes Declaration* at 15.

[34] *Id.*

Male, and . . . related to members of [the] Executive Management Team."[35]  Additionally, King disclosed for the first time she was experiencing "anxiety attacks, [] difficulty focusing and an overall feeling of discouragement," and she was receiving treatment for "Anxiety and ADHD."[36] King complained she did not have the assistance of a customer service representative (CSR), as ICG had purportedly guaranteed as part of her hiring.[37]  Finally, King asked Kerekes for "a clear definition of [her] role . . . and appropriate training on procedures and processes [to] enable [her] to succeed."[38]

### January 6, 2020 Meeting with King and Human Resources

After receiving King's email, Kerekes and Loach went "over King's allegations," focusing on "what had transpired . . . on December 11, 2019."[39]  Then, on January 6, 2020, Kerekes asked King to meet with him and Sandy Pearce, ICG's Manager of Client Services/Human Resources, to discuss the letter.[40]  In an hour-long, recorded meeting, Kerekes sought to explain the reasons for Loach's decision to reassign King's customer account on December 11, 2019, and dispel King's notion that the reassignment was animated by discriminatory or nepotistic aims.[41]  Kerekes also explained why King did not have a CSR assigned, noting her sales numbers did not clear ICG's $1 million threshold for assigning one.[42]

---

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.* ¶¶ 12–14.

[40] *Id.* ¶ 15; *2021 King Deposition* at 189:8–10, 319:17–22.

[41] *See generally Kerekes Declaration* at 16–38 (*Exhibit 2: Transcript of January 6, 2020 Meeting*); *see also* Dkt. 48, *Notice of Nonelectronic Filing of Recording.*

[42] *See Kerekes Declaration* at 20, 32.

During the January 6, 2020 meeting, Kerekes stressed ICG had been unaware King had any depression, anxiety, or other disability, but he "wanted to make sure [ICG] provide[d] any accommodation [she] need[ed]" to be successful.[43]  In a moment that has been sharply contrasted by both parties, Kerekes recounted a number of the characteristics listed on King's resume— "ambitious, assertive, outgoing, confident," and so forth—noting "[n]one of that hinted at there being a disability."[44]  But now that ICG was aware of King's disabilities, Kerekes asked King to "please let [them] know what [they could] do to better accommodate any needs [she had]."[45] King does not contest the specifics of the event, but portrays Kerekes' intent in a more malicious manner.[46]

The balance of the January 6, 2020 meeting focused largely on addressing King's request for further training and a clearer definition of her roles and responsibilities.[47]  Kerekes and Pearce went over some of the training resources available to King, and then sought to define King's sales goals—namely, "to build wealth and [] help develop revenue for the company, [and] communicate . . . [with her] clients."[48]  During these discussions, King noted her workload was "overwhelming," to which Kerekes responded: "Look.  Jody, how many jobs did you do last year?  You did 176 jobs.  I went and counted every one of them.  That's [fourteen] jobs a month.

---

[43] *Id.* at 21.

[44] *Id.*

[45] *Kerekes Declaration* at 21.

[46] *See also Amended Complaint: Causes of Action* at 3 ("[On] January 6, 2020, Kerekes ridiculed the Characteristics listed on my resume and stated there was nothing to indicate I had a disability when I was hired."); *Opposition* at 7 (reflecting King's position that "Kerekes disapprovingly read aloud characteristics listed on [her] resume and stated, 'None of that hinted at there being a disability''), 32 (maintaining "Kerekes . . . began mocking characteristics listed on [King's] Resume stating none of the characteristics hinted to King having a disability, [which] was patronizing at the very least").

[47] *See generally id.* at 21–38.

[48] *Id.* at 29.

You don't even do one job a day.  It's not overwhelming."[49]  At the same time, he acknowledged ICG had fallen short of the "regular goal setting meetings" contemplated by her employment offer, and ICG managers planned to start "having regular, quarterly meetings setting some sales goals with [her]."[50]  Additionally, Kerekes noted her sales numbers—around $376,000—were far below ICG's expectations of $750,000–800,000.[51]  When King stated she had been paid on a commission basis for most of her career, Kerekes pointed out ICG was willing to transition her to "100% commission," and she had "a change in contract discussion coming up in a few months."[52]

At the meeting's end, King reiterated her request for an assistant or CSR.[53]  However, Kerekes noted it did not make sense for the company "numbers-wise," and pointed out other sales representative did not have a designated CSR for decades or at all.[54]  In any event, King committed to start her training the following week, while Kerekes and Pearce stressed the company was looking out for its bottom line.  Kerekes encouraged King to use Loach as a resource and to escalate future customer concerns with the management team as needed.[55]

### January 9, 2020 Meeting between King, Loach, and Kerekes

Three days later, King met with Loach and Kerekes hoping "to clear the air" over everything that had transpired.[56]  During the recorded meeting, the attendees revisited the

---

[49] *Id.* at 30–31.

[50] *Id.* at 31.

[51] *Id.*

[52] *Id.*

[53] *Id.* at 32.

[54] *Id.*

[55] *Id.* at 36–37.

[56] *2021 King Deposition* at 29:6–14.

circumstances of December 11, 2019, and the reassignment of King's account to another sales representative.[57]  Loach explained King's customer was furious and demanded answers. Because the customer needed results before Christmas, and Loach did not know how long King would be out caring for her mother, Loach stated he "made the decision to reassign the account so that [the customer] could get taken care of."[58]  Loach noted it was a decision based on limited information, made "in the heat of battle," with a furious customer and a sales representative who was "out-of-action," all before he was supposed to leave on an overseas flight.[59]  Loach stood by his decision to reassign King's account, explaining he "honestly [thought she was] going to be gone for days, not hours," and he "just had to take care of it."[60]  He stressed the decision "wasn't punitive" and there was "no malice . . . [or] misintent [sic]"—it was about "taking care" of a customer who had driven fifty minutes to a scheduled meeting with a no-show sales representative.[61]

After thoroughly discussing the events of December 11, 2019, King raised her anxiety once again and challenged the way Kerekes pointed out characteristics on her resume during the prior meeting.[62]  Kerekes responded that he only alluded to King's resume as a way of showing he was "fully unaware of any disability," particularly given their limited experience working together.[63]  Noting his wife has "it," Kerekes explained "[i]t's not something that you visually

---

[57] *Loach Declaration* ¶ 23; *see also Kerekes Declaration* at 39–76 (*Exhibit 3: Transcript of January 9, 2020 Meeting*).

[58] *Kerekes Declaration* at 42.

[59] *Id.* at 44–48.

[60] *Id.*

[61] *Id.* at 45.

[62] *Id.* at 50–51.

[63] *Id.* at 51.

see with somebody that you just spend a limited time with."[64]  "[N]ow that [he was] fully

aware," Kerekes asked King once again what kind of accommodations she needed to be

successful.[65]  King responded she felt like she had everything she needed, before later requesting

"some training on Trello," an application used by other ICG employees.[66]  Kerekes and Loach

agreed to connect her with another ICG employee on Trello and set plans for King to receive

follow-on training.[67]  At the end of the meeting, Loach reminded King that her employment

agreement was set to be "marked, so [they would] need to . . . look at that and see where [they

are]—figures wise and sales wise."[68]  He noted they would "touch base with [her] on that one

and . . . make sure [they're] all on the same page."[69]

### King Requests FMLA Leave

The record contains sparse details about the first few weeks following these two meetings

between King and ICG managers.  According to ICG, King never actually "attend[ed] any

additional training and did not follow up with" ICG's human resources team after the meetings.[70]

King argues Loach "had no plans to provide any form of training or support" and she received no

further correspondence offering additional training.[71]

On March 6, 2020—two weeks before her contract was set to expire—King sent an email

to ICG's President, Dave Macfarlane, stating she was "recently [] diagnosed with a serious

---

[64] *Id.*

[65] *Id.* at 52.

[66] *Id.* at 53, 61.

[67] *Id.* at 61–63.

[68] *Id.* at 68.

[69] *Id.*

[70] *Motion for Summary Judgment* at 11 (citing *2021 King Deposition* at 196:8–13, 198:17–19; Dkt. 46-5, *Exhibit D to ICG's Motion for Summary Judgment: Sandy Pearce Declaration* ¶¶ 4–5).

[71] *See Opposition* at 8.

health condition" and was requesting medical leave.[72]  Macfarlane forwarded the email to

Kerekes, who replied to King the same day, stating he was "interpreting [her email] as a FMLA

request."[73]  He asked her to have her physician complete an FMLA form and return the form to

him.[74]  King's physician completed the form, suggesting March 10, 2020 through June 10, 2020

was the "probable duration of [her] condition."[75]  ICG then granted King twelve weeks of unpaid

FMLA leave through June 10, 2020.[76]  Given King's absence, Kerekes explained ICG would

need "to accommodate the needs of [ICG's] clients that [were] assigned to [her]," and the team

would "collaborate internally to see those needs are being met."[77]

### *New Customer Complaints*

During the transition of King's customer accounts to other sales representatives for the

duration of her FMLA leave, Loach received complaints from four of King's customers.[78]  In

recounting a meeting with one of these customers, Granger Medical, Loach noted the customer's

point-of-contact was "having significant issues" with King—ranging from poor communication

to untimely orders.[79]  Loach further remarked the customer had started "diverting some of their

larger orders from [ICG] to another printing company because they [] lost confidence" in ICG's

customer service and timeliness.[80]  Loach recounted that another customer, Astro Burger,

---

[72] *Kerekes Declaration* at 77–78 (*Exhibit 4: March 6, 2020 Email from King Forwarded to Kerekes*).

[73] *Id.* at 79–80 (*Exhibit 5: March 6, 2020 Email from Kerekes to King*).

[74] *Id.*

[75] *Motion for Summary Judgment* at 11–12; *see also Kerekes Declaration* at 86–90 (*Exhibit 8: King FMLA Paperwork*); Dkt. 46-6, *Exhibit E to ICG's Motion for Summary Judgment: 2023 King Deposition* at 59:17–60:19.

[76] *Motion for Summary Judgment* at 12 (citing *2023 King Deposition* at 78:22–25; *2021 King Deposition* at 130:15–18; *Kerekes Declaration* ¶ 28).

[77] *Kerekes Declaration* at 80.

[78] *See Motion for Summary Judgment* at 12 (citing *2021 King Deposition* at 229:9–17; *Loach Declaration* ¶¶ 25–27, 29–31); *see also* Dkt. 46-7, *Exhibit F to ICG's Motion for Summary Judgment: Sandy Jones Declaration* ¶¶ 5–9.

[79] *Loach Declaration* ¶ 25; *see also id.* at 16–17 (*Exhibit 3: March 10, 2020 Granger Medical Meeting Notes*).

[80] *Id.* ¶ 25.

complained King was "non-responsive to [its] print needs" and requested its account be reassigned to another sales representative at ICG.[81] A third customer, Atlantis Burger, "expressed frustration and disappointment about King's delay in fixing a printing error."[82] ICG received a fourth and final complaint from White Pine Tourism.[83]  In response to these customer complaints, Loach drafted two performance-related Employee Warning Reports discussing the complaints and stressing that "[c]ustomer service should be the priority of [ICG] sales representatives," with plans to discuss the reports with King after her return from FMLA leave.[84] Additionally, Loach reassigned King's Granger Medical and Astro Burger accounts to a new sales representative because they "specifically requested reassignment."[85]  King broadly challenges the veracity of these customer complaints and offers a number of explanations for why ICG might have fallen short of customer expectations, beyond her own role as the sales representative.[86]  However, King's conclusory and unsubstantiated assertions do not raise a genuine dispute of material fact over the customer complaints, which are amply documented by ICG.

### *King Attempts to Return from FMLA Leave*

King's 2018 compensation agreement expired according to its terms on March 20, 2020, while she was on FMLA leave.[87]  King argues the expiration of the 2018 compensation

---

[81] *Id.* ¶ 26, *Motion for Summary Judgment* at 12.

[82] *Motion for Summary Judgment* at 13, *Loach Declaration* ¶ 29.

[83] *Loach Declaration* ¶ 31.

[84] *Motion for Summary Judgment* at 13; *see also Loach Declaration* at 18–19 (*Exhibit 4: March 11, 2020 Employee Warning Report*), 23–24 (*Exhibit 6: March 30, 2020 Employee Warning Report*).

[85] *Motion for Summary Judgment* at 26 (citing *Loach Declaration* ¶ 25).

[86] *See Opposition* at 9–10.

[87] *Motion for Summary Judgment* at 12 (citing *2021 King Deposition* at 238:21–239:11; *Kerekes Declaration* ¶ 30).

agreement did not "supersede the FMLA."[88]  Additionally, she points out other terms of her

compensation agreement, such as holding regular employee reviews, were not consistently

enforced by ICG.[89]  For the limited purpose of summarizing the record, the court agrees with

ICG that the agreement expired on its own terms on March 20, 2020.[90]

On March 31, 2020, King notified Loach and Kerekes by email that her "treatment

seem[ed] to be working" and she was "eager to get back to work [the following] week."[91]  In

light of the nascent COVID-19 pandemic, King asked for permission to work remotely.[92]  In

response, Kerekes, Loach, and Pearce followed up with King and arranged a telephone

conference for April 7, 2020.[93]  During the recorded call, Kerekes explained the COVID-19

pandemic was causing significant business uncertainty and ICG "even had to lay off a couple of

sales rep[resentatives]."[94]  He also reminded her that her 2018 compensation agreement had

expired and stated ICG had prepared a new contract for her, which was "100% based on

commissions," as was "standard . . . [and] customary . . . after two years."[95]  Loach then went

over the customer complaints he received during her FMLA transition and explained why some

of her accounts were permanently reassigned to other sales representatives.[96]  In response, King

challenged Loach's description of the customer complaints and stressed she did not feel

---

[88] *See Opposition* at 9.

[89] *Id.* at 6.

[90] The court discusses King's arguments concerning the expiration of her 2018 compensation agreements further below.

[91] *Kerekes Declaration* at 91–92 (*Exhibit 9: March 31, 2020 Email from King to Kerekes*).

[92] *Id.*

[93] *Motion for Summary Judgment* at 14.

[94] *Kerekes Declaration* at 98 (*Exhibit 11: April 7, 2020 Transcript*).

[95] *Id.*

[96] *Id.* at 99.

supported by Loach or ICG.[97]   Pearce pointed out King never attended or pursued the additional

training that was offered at the January 2020 meetings, noting "the offer [was] still out there."[98]

Finally, Loach concluded the call by reiterating that "whatever [King] need[ed] to be

successful," such as "training and support," would be provided.[99]

   After the telephone conference, Kerekes sent King a copy of the new commission-based

compensation plan,[100] prompting a brief exchange of emails.[101]   In these emails, King requested,

among other things, clarification of "a few gray areas," the ability to work remotely due to

COVID-19, and reinstatement of the customer accounts that were transferred to other sales

representatives.[102]   Kerekes responded that all ICG sales representatives were working from

home due to the COVID-19 pandemic and King would be permitted to do the same.[103]

However, he declined King's request for the customer accounts to be reassigned to her, noting

that the respective clients "complained and/or asked to be reassigned."[104]   Finally, Kerekes

reiterated ICG's expectations that she "reach out to prospective and existing clients, build

rapport, deliver timely and quality products and be available and responsive to existing clients'

questions, needs and concerns."[105]   He noted ICG's expectation was that she reach annual sales

of "$750,000 per year and upwards."[106]

---

[97] *Id.* at 99–104.

[98] *Id.* at 104.

[99] *Id.* at 107.

[100] *2021 King Deposition* at 238:21–239:9; *Kerekes Declaration* ¶ 32.

[101] *Kerekes Declaration* at 109–12 (*Exhibit 12: April 10 and April 14, 2020 Emails between King and Kerekes*).

[102] *Id.* at 110.

[103] *Id.* at 111.

[104] *Id.* at 111–12.

[105] *Id.*

[106] *Id.*

On April 16, 2020, King sent a letter to the President of ICG, David Macfarlane, expressing her "reasonable and genuine belief [she had] been subjected to unwelcome and oppressive conduct by members of [ICG's] Management Team."[107]  She complained about Loach and Kerekes' conduct during the January 2020 meetings and April 7 telephone conference, emphasizing Kerekes' reference to the characteristics listed on her resume.[108]  She asserted "[t]he continuous offensive behavior demonstrated by [ICG] Management toward [her was] intimidating . . . [and] created a hostile and oppressive work environment."[109]

Macfarlane responded the following day, stating he "thoroughly reviewed [her] email and followed up with [Pearce, Kerekes] and [] Loach" about her concerns.[110]  Macfarlane noted these employees considered their interactions with King to be "fair, just and honorable," and ICG "promptly investigated and responded to all of [her] allegations."[111]  He also pointed out that King's former compensation plan had expired and she had been provided "with a [new] compensation agreement that require[d] her signature."[112]  If ICG did not hear from her by April 20, 2022, Macfarlane stated he would assume she "voluntarily resigned [her] employment"—a date he later pushed to April 22, 2020, after realizing he only sent the email to her work email address.[113]

---

[107] Dkt. 46-8, *Exhibit G to ICG's Motion for Summary Judgment: David Macfarlane Declaration* at 5–8 (*Exhibit 1: April 16, 2020 Letter from King to Macfarlane*).

[108] *Id.* at 6–7.

[109] *Id.* at 8.

[110] *Id.* at 9–10 (*Exhibit 2: April 17, 2020 Email from Macfarlane to King*).

[111] *Id.* at 10.

[112] *Id.*

[113] *Id.*; *see also Motion for Summary Judgment* at 16 n.6 (explaining Macfarlane "extended the report-to-work date to April 22, 2020" after resending the email to King's personal email address after realizing he originally sent it only to her work email address).

On April 22, 2020, King sent an email to Macfarlane and Pearce, noting she was "ready, willing and able to return to work."  However, when she learned four of her accounts had been transferred to other sales representatives and her compensation plan had materially changed, she informed ICG she had "consulted legal counsel to review the Employment Contract and other documentation before [] sign[ing] it."[114]  Additionally, King requested further accommodations—"[p]articularly someone who can assist when [she] experienc[es] symptoms such as joint/muscle aches, sweating excessively, and other significant symptoms."[115]

Macfarlane sent a response to King two days later, stating she was "on FMLA until June 9, 2020," and was "previously provided with a compensation plan . . . [which would] need to [be] agree[d] and sign[ed] . . . before returning to work."[116]  However, there was no further response or communication from King for the next several weeks.[117]

On June 9, 2020, Kerekes sent King an email reminding her that her FMLA expired that day and requested she return to work the following day by 9:00 a.m.[118]  King responded she would return to work "over [her] objection," reiterating that she would do so "remotely . . . as an accommodation," with her lawyer added to the 'cc line.[119]  However, the next morning at 9:00 a.m., King sent an email stating she was "unable to log into [her] company laptop" and "as [she] was reaching for [her company cell phone] out of a cabinet, [it] fell and was broken."[120]  Announcing that she had an "appointment with [her] Physician later [that] afternoon," King

---

[114] *Macfarlane Declaration* at 13–14 (*Exhibit 4: April 22, 2020 Email from King to Macfarlane*).

[115] *Id.*

[116] *Id.* at 15–16 (*Exhibit 5: April 24, 2020 Email from Macfarlane to King*).

[117] *See Macfarlane Declaration* ¶ 7l.

[118] *Kerekes Declaration* at 113–15 (*Exhibit 13: June 9, 2020 Email Exchange between King and Kerekes*).

[119] *Id.* at 114.

[120] *Id.* at 116–19 (*Exhibit 14: June 10, 2020 Emails from King to Kerekes*).

explained she would "get back to [them] tomorrow."[121]  Later that evening, King sent a new

request for four weeks of FMLA leave and asked to use her "accrued [two] weeks['] vacation

time for some of the FMLA time."[122]

Kerekes responded to King's latest FMLA request by noting that FMLA "allows eligible

employees to take [twelve] work weeks in a [twelve]-month period of unpaid, job-protected

leave."[123]  But because she had already exhausted thirteen weeks of FMLA leave, Kerekes

explained to King she had "no additional leave time under the FMLA."[124]  In any event, Kerekes

noted she "may be entitled to leave under the Americans with Disabilities Act," but ICG would

need additional information from King's healthcare provider first.[125]  The following day, King's

lawyer responded they had "requested additional information from [] King's doctor and [would]

be in touch shortly."[126]  Around the same time, ICG deposited $1,826.10 into King's checking

account before withdrawing it on June 12, 2020.[127]  ICG contends it received no further

correspondence from King, her attorney, or King's healthcare provider,[128] while King states "she

believes her physician sent paperwork to ICG."[129]  On July 14, 2020, after King again failed to

---

[121] *Id.*

[122] *Id.*

[123] *Id.* at 120–23 (*Exhibit 15: June 15, 2020 Email from Kerekes to King*).

[124] *Id.* at 121–22.

[125] *Id.*

[126] *Id.* at 124–25 (*Exhibit 16: June 16, 2020 Email from Florence Miller to Kerekes*).

[127] *See Opposition* at 12–13 (citing Dkt. 50-6, *Exhibit 5 to King's Opposition: Transaction History*).

[128] *Motion for Summary Judgment* at 18.

[129] *Opposition* at 13 (citing Dkt. 50-13, *Exhibit 12 to King's Opposition: Physician Note* ("I believe that we sent over FMLA documentation explaining your additional FMLA requirement.  If they have not received this, then we will need to do this again.")).

return to work, ICG concluded King had abandoned her position and "separated employment" with her.[130]

### Post-Separation

In the following months, King pressed a wage claim with the U.S. Department of Labor Wage and Hour Division and the Utah Antidiscrimination and Labor Division (UALD) to recover payment for the two weeks of vacation time she requested on June 10, 2020.[131]  Though ICG maintained King had not accrued any vacation time before she went on FMLA leave and her new compensation plan did not entitle her to paid vacation time, it paid her $1,826.10 for one full week of vacation "to avoid an ongoing dispute with King."[132]

### Procedural History

On December 30, 2021, King filed the present action against ICG, asserting several claims based on, among other things, ICG's purported retaliation, harassment, and discrimination.[133]

Defendants filed a Motion for Summary Judgment on June 1, 2023.  Defendants' Motion is fully briefed, oral argument was heard on October 3, 2023,[134] and the matter taken under advisement.  Having discussed the record set forth in the parties' briefing and attached affidavits and exhibits, the court next turns to the legal standards governing the parties' dispute.

---

[130] *Motion for Summary Judgment* at 18.

[131] *See Kerekes Declaration* at 126–28 (*Exhibit 17: October 5, 2020 Wage Claim*).

[132] *Id.* ¶¶ 45–46.  Both ICG and King state this $1,826.10 is payment for one week of vacation.  *See Motion for Summary Judgment* at 18 ("In any event, ICG provided King with one week of paid vacation for 2020."); *Opposition* at 14 (reflecting that King had two weeks of pay but ICG only provided one week).  However, it appears the $1,826.10 payment reflects two weeks of pay.  For a further discussion, see n. 181.

[133] *See* Dkt. 1, *Complaint*.

[134] Dkt. 59, *Minute Entry for Proceedings on October 3, 2023*.

## LEGAL STANDARDS

Summary judgment is proper so long as "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[135]  A fact is material if it "might affect the outcome of the suit under the governing law," and a dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[136]  In applying these standards, the court views the evidence and draws inferences in the light most favorable to the nonmoving party.[137]

At summary judgment, the moving party bears "both the initial burden of production on a motion for summary judgment and the burden of establishing that summary judgment is appropriate as a matter of law."[138]  However, to meet this burden, the moving party "need not negate the non-movant's claim, but need only point to an absence of evidence to support the non-movant's claim."[139]

If the moving party satisfies its initial burden, the nonmoving party must "bring forward specific facts showing a genuine issue for trial as to those dispositive matters for which it carries the burden of proof."[140]  In doing so, the nonmoving party must produce evidence—borne out "by reference to affidavits, deposition transcripts, or specific exhibits"[141]—that is "based on more than mere speculation, conjecture, or surmise."[142]

---

[135] Fed. R. Civ. P. 56(a).

[136] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

[137] *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010).

[138] *Kannady v. City of Kiowa*, 590 F.3d 1161, 1169 (10th Cir. 2010) (internal quotation marks and citations omitted).

[139] *Id.*

[140] *Id.*

[141] *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1998).

[142] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

In applying these principles, the court is mindful that King—though represented by counsel earlier in this litigation—now proceeds pro se.  Pro se litigants are held to less stringent standards than parties formally represented by lawyers, and their filings are "to be liberally construed."[143]  In opposing ICG's Motion, however, King is still "required to do more than provide her conclusory assertions or subjective interpretation of the evidence; she [is] required to present admissible evidence of material fact."[144]  "[C]onclusory allegations standing alone will not defeat a properly supported motion for summary judgment."[145]  Ultimately, it is not "the proper function of the district court to assume the role of advocate for the pro se litigant" or to salvage her claims.[146]

## ANALYSIS

King asserts the following claims against ICG: (1) FMLA interference; (2) FMLA retaliation; (3) failure to accommodate her disability; (4) harassment based on disability; (5) discrimination based on disability, sex, and/or age; and (6) retaliation based on her gender, age, and/or disability.[147]  ICG argues King cannot sustain any of these claims because, among other defects, she "cannot establish a causal connection between [ICG's] actions and either a protected status or activity."[148]  Moreover, ICG asserts "[n]one of the actions ICG took . . . related in any way to [King's] use of FMLA leave, her disability, her age, or her gender."[149]  For the reasons

---

[143] *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (internal citation and quotation marks omitted).

[144] *Schlecht v. Lockheed Martin Corp.*, 626 F. App'x 775, 779 (10th Cir. 2015); *see also Gross v. Burggraf Constr. Co.*, 53 F.3d 1531, 1546 (10th Cir. 1995) (stating "[s]ufficient evidence (pertinent to the material issue) must be identified by reference to an affidavit, a deposition transcript, or a specific exhibit incorporated therein" (internal quotation marks and citation omitted)).

[145] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[146] *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[147] *See generally Amended Complaint*; *Amended Complaint: Causes of Action*.

[148] *Motion for Summary Judgment* at 2.

[149] *Id.*

discussed herein, the court concludes King's narrow lack-of-notice theory survives summary judgment, but King fails to meet her burden to show a genuine issue for trial on the rest. Accordingly, the court GRANTS IN PART and DENIES IN PART ICG's Motion.

## I.    FMLA Claims

### a.    FMLA Interference

King first claims ICG interfered with her FMLA rights by, among other things, compelling her to "take more leave than required" and then rescinding "her employment during her FMLA leave."[150]  ICG moves for summary judgment on King's FMLA interference claim on the grounds it "neither prevented King from taking the full twelve weeks of FMLA leave, nor denied her permission to take such leave."[151]

Under FMLA, eligible employees are entitled to "up to twelve weeks of unpaid leave . . . for serious health conditions and reinstatement to the former position or an equivalent one upon return from that leave."[152]  "The FMLA makes it unlawful for an employer to interfere with, restrain, or deny the exercise or attempt to exercise any right provided under the FMLA."[153]  To succeed on a claim for FMLA interference, an employee must demonstrate "(1) she was entitled to FMLA leave; (2) some adverse action by the employer interfered with her right to take FMLA leave; and (3) the employer's action was related to the exercise or attempted exercise of her FMLA rights."[154]  Unlike many other types of employment claims, "a denial, interference, or restraint of FMLA rights is a violation regardless of the employer's intent."[155]  However, an

---

[150] *Opposition* at 15.

[151] *Motion for Summary Judgment* at 21.

[152] *Metzler*, 464 F.3d at 1180 (citing 29 U.S.C. §§ 2612(a)(1), 2614(a)).

[153] *Brown v. ScriptPro, LLC*, 700 F.3d 1222, 1226 (10th Cir. 2012) (citing 29 U.S.C. § 2615(a)(1)).

[154] *Nebeker v. Nat'l Auto Plaza*, 643 F. App'x 817, 822 (10th Cir. 2016).

[155] *Metzler*, 464 F.3d at 1180.

employer may avoid liability by showing the employee "would have been dismissed regardless of the employee's request for, or taking of, FMLA leave."[156]  Additionally, "[a]n employee may recover only if she shows the employer's violation prejudiced her."[157]

ICG does not dispute that King satisfies the first element of an FMLA interference claim—entitlement to FMLA leave.[158]  In establishing the adverse action element of an FMLA interference claim, "an employee must show [] she was prevented from taking the full [twelve] weeks of leave guaranteed by the FMLA, denied reinstatement following leave, or denied initial permission to take leave."[159]  Additionally, federal regulations state an employer's failure to comply with its notice obligations may sustain an FMLA interference claim under certain circumstances.[160]  However, the FMLA's enforcement provision provides no relief to an employee unless she was actually prejudiced by the violation.[161]  "An FMLA violation prejudices an employee only when the employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment status remediable through appropriate equitable relief."[162]

---

[156] *Id.*; *see also Brown*, 700 F.3d at 1227 ("An employer can defend against the claim . . . by showing that the employee would have been terminated . . . regardless of the request for FMLA leave.").

[157] *Nebeker*, 643 F. App'x at 822.

[158] *See Motion for Summary Judgment* at 21.

[159] *Campbell v. Gambro Healthcare, Inc.*, 478 F.3d 1282, 1287 (10th Cir. 2007) (quoting *Jones v. Denver Pub. Sch.*, 427 F.3d 1315, 1319 (10th Cir. 2005) (cleaned up)); *see also Steckmyer-Stapp v. PetSmart, Inc.*, No. 15-cv-00025-RM-STV, 2016 U.S. Dist. LEXIS 166712, at *12–13 (D. Colo. Nov. 29, 2016) (citing *Hillig v. Rumsfeld*, 381 F.3d 1028, 1032–33 (10th Cir. 2004)) ("An adverse employment action includes those where an employee sustains a significant change in employment status, such as in hiring, being fired, failing to be promoted, being reassigned with significantly different responsibilities, or having a significant change in benefits.").

[160] *See* 29 C.F.R. § 825.300(e).

[161] *See Branham v. Delta Airlines*, 678 F. App'x 702, 706 (10th Cir. 2017).

[162] *Rodriguez-Ortega v. Rich*, No. 21-cv-01129 JCH/KK, 2023 U.S. Dist. LEXIS 21977, at *40–41 (D.N.M. Feb. 9, 2023) (citing *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002)); *see also* 29 C.F.R. § 825.300(e) (explaining conditions for employer liability for notice deficiencies).

King identifies three adverse actions by ICG that purportedly interfered with her FMLA rights: (1) failing to provide her with required notice of her FMLA rights; (2) prohibiting her from using accrued paid vacation during her FMLA leave; and (3) refusing to reinstate her when she asked to return from FMLA leave.[163]

### i. King's lack-of-notice theory survives summary judgment.

King first claims ICG failed to "provide [her] with a Notice of Eligibility, Rights [and] Responsibilities, or a Designation Notice," as required by 29 C.F.R. § 825.300.[164]  Under § 825.300(b)(1), "when the employer acquires knowledge that an employee's leave may be for an FMLA-qualifying reason, the employer must notify the employee of [her] eligibility to take FMLA leave within five business days, absent extenuating circumstances."[165]  It must also provide a rights-and-responsibilities notice, reflecting, among other things, information concerning the "employee's right to substitute paid leave" and "[a]ny requirements for the employee to furnish certification of a serious health condition."[166]  Failure to follow these notice

---

[163] *Opposition* at 15–20.  King also asserts ICG interfered with her rights under FMLA by forcing her to take "more leave than required."  *See id.* at 15 (citing 29 C.F.R. § 825.700(a)).  However, ICG points out that § 825.700(a) simply provides that an employer may provide greater rights than afforded by the FMLA, but may not "diminish" the rights established by the FMLA.  Neither 29 C.F.R. 825.700(a) nor any cases cited by King stand for the proposition that "an employer cannot compel an employee to take more leave than required."  Indeed, "[t]he Tenth Circuit has not formally adopted an 'involuntary leave' type of interference claim."  *Jackson v. J.R. Simplot Co.*, No. 15-CV-0112-NDF, 2016 U.S. Dist. LEXIS 190213, at *24 (D. Wyo. Apr. 21, 2016).  The Sixth Circuit has recognized an involuntary leave FMLA interference claim may exist "when an employer forces an employee to take FMLA leave when the employee does not have a 'serious health condition' that prevents her from working."  *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 449 (6th Cir. 2007).  But these claims "ripen[] only when and if the employee seeks FMLA leave at a later date, and such leave is not available because the employee was wrongfully forced to use FMLA leave in the past."  *Id.*  While it is unclear whether the Tenth Circuit would recognize an "involuntary leave" FMLA interference claim, the court concludes it is not necessary to address this theory because King's allegations of forced leave do not implicate a recognized framework for such a claim.  Accordingly, the court focuses on King's other theories of interference.

[164] *See Opposition* at 18.

[165] 29 C.F.R. § 825.300(b)(1).

[166] *Id.* § 825.300(c)(1).

requirements "may constitute an interference with . . . an employee's FMLA rights" where an employee suffered "actual monetary losses" as a direct result of the violation.[167]

Here, the undisputed record shows ICG promptly treated King's March 6, 2020 "Medical Leave of Absence Request" as a request for FMLA leave.[168]  However, nothing in the record suggests ICG provided King with an eligibility notice or rights-and-responsibilities notice, as required by § 825.300.  Instead, ICG provided general "notice . . . in both its Employee Handbook and on official Department of Labor posters posted in conspicuous places in its facility."[169]

Though "the mere fact of a technical violation does not equate to interference,"[170] King asserts ICG's failure to provide her with the required notice undermined her ability to make "informed decisions about  FMLA leave" and, by extension, deprived her of two weeks of pay because she "was not offered to utilize . . . accrued paid vacation."[171]  If so, this would constitute an "actual monetary loss[] sustained as a direct result of [ICG's] violation" of § 825.300, making ICG's notice deficiency more than a mere "technical violation" and creating potential liability for ICG.[172]

---

[167] *Id.* § 825.300(e).

[168] *See Kerekes Declaration* at 80.

[169] *Motion for Summary Judgment* at 23 (citing *Kerekes Declaration* ¶¶ 26–27).

[170] *Steckmyer-Stapp*, 2016 U.S. Dist. LEXIS 166712, at *14 (granting summary judgment against an employee's FMLA interference claim because, while the employer's purported notice deficiencies "may [have been] technical violations of the FMLA, . . . [they] did not reduce benefits or constitute some denial of leave").

[171] *See Amended Complaint* at 3; *Amended Complaint: Causes of Action* at 1.

[172] *See* 29 C.F.R. § 825.300(e).

ICG counters "[i]t is undisputed [] King took two weeks paid vacation in 2019 . . . [and] had not accrued additional vacation time" when she requested FMLA leave.[173]  ICG points to King's 2018 employment agreement, which states she would receive "[two] weeks of paid vacation one year following the date of hire,"[174] and argues this would have been entirely used up by King's two-week vacation during 2019.[175]  King does not contest that she took two weeks of vacation in 2019, but she argues she still had vacation remaining.[176]  In her April 10, 2020 email to Kerekes, she reported she still had two weeks of unused vacation time.[177]  Additionally, as an exhibit to her Opposition, King presents a paystub, dated March 5, 2020, showing a balance of eighty hours of vacation the day before she requested medical leave.[178]  Viewing the evidence and drawing all reasonable inferences in the light most favorable to King, the court concludes the proffered evidence raises a genuine dispute over whether King had two weeks of paid leave available when she requested FMLA leave.

ICG argues this claim is moot because in October 2020 "ICG [] paid King $1,826.10, the amount she requested, in settlement of her wage claim for vacation pay."[179]  Both parties agree this was payment for only for one week of vacation.[180]  However, King has offered evidence she had two weeks of vacation available.  Therefore, King has presented evidence of a dispute of

---

[173] *Motion for Summary Judgment* at 23 (citing *Kerekes Declaration* ¶ 45); *Reply* at 3 ("King used two weeks of vacation leave in 2019, thus depleting her accrual before the 2020–2021 Plan, which does not provide paid vacation, took effect.").

[174] *Loach Declaration* at 12.

[175] *2023 King Deposition* at 13:7–21.

[176] *2023 King Deposition* at 13:7–21.

[177] *Kerekes Declaration* at 110.

[178] Dkt. 50-7, *Exhibit 6 to King's Opposition: March 5, 2020 Paystub*.

[179] *Kerekes Declaration* at 127-35 (*October 5, 2020 Wage Claim* and *Vacation Pay to King*).

[180] *See Motion for Summary Judgment* at 18 ("In any event, ICG provided King with one week of paid vacation for 2020."); *Opposition* at 14 (reflecting King's argument she had two weeks of paid vacation left when ICG provided only one week of paid vacation).

material fact that she was prejudiced by the lack-of-notice, which prevented her from using both weeks of vacation pay.[181]

In light of King's contention that her lack of notice undermined her ability to make an informed decision regarding FMLA leave and the existence of a genuine issue of material fact concerning whether that lack of notice potentially cost her a week of paid leave, the court concludes her lack-of-notice theory survives summary judgment.[182]

> ### ii. King does not produce triable evidence that ICG prevented her use of paid leave in June 2020 because King had already depleted her FMLA leave by that point.

King's second theory of FMLA interference is that ICG prohibited "King's use of her accrued vacation[], contradicting [its] own . . . Employee Handbook."[183]  While "the FMLA does not guarantee *paid* leave,"[184] "FMLA permits an eligible employee to choose to substitute accrued paid leave for FMLA leave. . . . An employee's ability to substitute accrued paid leave is determined by the terms and conditions of the employer's normal leave policy."[185]  ICG does not contest King's assertion that ICG's Employee Handbook allows employees to substitute accrued

---

[181] The court notes it reads the record differently than both parties and believes ICG may have paid King for two weeks of vacation in October 2020.  King's paystub from March 5, 2020, reflects 80 hours, or two weeks, of work and her net pay is $1,826.10.  *March 5, 2020 Paystub*.  ICG's payment from October 2020 also shows a net pay of $1,826.10.  *Vacation Pay to King*.  If ICG indeed paid out two weeks of vacation, then King was not actually prejudiced by the lack-of-notice violation.  However, the court is constrained by the facts each party has offered in its briefing.

[182] See *Greenwell v. Charles Mach. Works, Inc.*, No. CIV-10-0313-HE, 2011 U.S. Dist. LEXIS 41799, at *13–14 (W.D. Okla. Apr. 15, 2011) (finding defendant's failure to notify plaintiff of his eligibility for FMLA leave was sufficient to satisfy the second element of a FMLA interference claim); *Hannah P. v. Haines*, 577 F. Supp. 3d 429, 442 (E.D. Va. 2021) (denying summary judgment on an FMLA interference claim because "[t]he evidence establishe[d] that plaintiff was prejudiced by defendant's failure to provide her notice of her right to take sick leave under the FMLA" and the plaintiff suggested she would have structured her leave differently); *see also Vannoy v. FRB of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016) ("Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently." (collecting cases)).

[183] *See Opposition* at 17; *see also Kerekes Declaration* at 118 (reflecting King's June 10, 2020 request for additional FMLA leave and to use her accrued vacation time).

[184] *Dulany v. Brennan*, 736 F. App'x 199, 203 (10th Cir. 2018) (emphasis in original).

[185] 29 C.F.R. § 825.207(a).

paid leave for FMLA.  Instead, as discussed above, ICG maintains "King deplet[ed] her accrual before the 2020–2021 Plan, which does not provide paid vacation, took effect."[186]  Additionally, ICG points out that King "received over 12 weeks of FMLA leave from March 10, 2020 to June 10, 2020,"[187] thereby exhausting her FMLA leave.

While the exact amount of King's vacation accrual is disputed,[188] it is well established that "employees cannot substitute paid vacation time for FMLA time if they do not have FMLA time remaining."[189]  As the Eleventh Circuit has observed, "[t]he ability to take particular days of non-FMLA vacation is not a right protected by the FMLA and thus, as a matter of law, cannot be the predicate for a FMLA interference claim."[190]  Because there is no evidence King was denied the ability to use her vacation time to supplement her FMLA leave before that leave elapsed, ICG's purported denial of her request for vacation time does not constitute FMLA interference.

---

[186] *Reply* at 3.

[187] *Motion for Summary Judgment* at 21.

[188] *See supra* Section I(a)(i)(a).

[189] *Scraggs v. NGK Spark Plugs (U.S.A.) Inc.*, No. 2:15-cv-11357, 2016 U.S. Dist. LEXIS 87841, at *6 (S.D. W. Va. July 7, 2016) (rejecting "out of hand" an employee's argument that her employer interfered with her FMLA rights by "failing to substitute her paid vacation time for FMLA time to cover her absences" that occurred after she had exhausted twelve weeks of FMLA leave); *see also* 29 C.F.R. § 825.207(a).

[190] *Drago v. Jenne*, 453 F.3d 1301, 1306 (11th Cir. 2006).

### iii. King does not produce triable evidence that ICG's refusal to reinstate her without agreeing to the new compensation interfered with her FMLA rights.

As a final matter, King asserts ICG interfered with her FMLA rights by refusing to reinstate her at the end of her FMLA leave to her previous position with the same compensation structure and conditions of employment,[191] as required by the FMLA.[192]

### a. ICG's refusal to reinstate King is an adverse action.

The Tenth Circuit has recognized that an employee can satisfy the adverse action element of an FMLA interference claim by showing she was "denied reinstatement following leave."[193] In particular, King points out that her "reinstatement . . . hinged on her consent to the 2020 employment agreement,"[194] which deviated sharply from the terms of her pre-FMLA agreement. However, ICG counters that "[t]he record unequivocally demonstrates that ICG never denied King's reinstatement,"[195] noting King's 2018 agreement was set to expire and transition long before she ever went on leave.[196]

Because summary judgment requires the court to "draw[] all inferences in the light most favorable to the nonmoving party,"[197] the court concludes for the narrow purpose of establishing the adverse action element of her FMLA claim that King was denied reinstatement.  The FMLA requires a returning employee "to be restored . . . to the position of employment held . . . when

---

[191] *See Amended Complaint: Causes of Action* at 1–2; *Opposition* at 15–20.

[192] *See* 29 U.S.C. § 2614(a)(1) ("[A]ny eligible employee who takes leave under [the FMLA] . . . shall be entitled, on return from such leave . . . to be restored by the employer to the position of employment held by the employee when the leave commenced.").

[193] *Campbell*, 478 F.3d at 1287 (10th Cir. 2007) (quoting *Jones*, 427 F.3d at 1319 (cleaned up)).

[194] *Opposition* at 17.

[195] *Reply* at 5; *see also Motion for Summary Judgment* at 21–22.

[196] *See Motion for Summary Judgment* at 24.

[197] *Nahno-Lopez*, 625 F.3d at 1283.

the leave commenced . . . [or] to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."[198]  But here, ICG managers repeatedly made King's return contingent on her acceptance of a new—and less lucrative—compensation plan.[199]  Regardless of the logical reasons for ICG's conditional return offer, the practical effect was to deny King's "restor[ation] . . . to the position of employment [she] held . . . when the leave commenced" or to an equivalent position.[200]  Accordingly, the court concludes ICG's refusal to reinstate King unless she accepted a new commission-based agreement qualifies as an "adverse action" for the purpose of satisfying the second element of her FMLA interference claim.[201]

### b.  ICG's refusal to reinstate King is not related to her FMLA leave.

But that does not mean the reasons for King's compensation shift and conditional reinstatement are wholly irrelevant.  Because King has established the first two elements of her FMLA interference claim, the burden shifts to ICG to produce facts showing King would have experienced the adverse actions regardless of her request for FMLA leave.[202]  "In meeting this

---

[198] 29 U.S.C. § 2614(a)(1).

[199] *See, e.g.*, *Kerekes Declaration* at 98, 111 (stating King could "return to work . . . as soon as [she] execute the compensation agreement [] provided to [her]"); *Macfarlane Declaration* at 12, 16 (stating King would "need to . . . sign the plan before returning to work").

[200] *See* 29 U.S.C. § 2614(a)(1)(A); *see also* 29 C.F.R. § 825.214(a) ("On return from FMLA leave, an employee is entitled to be returned to the same position the employee held when leave commenced, or to an equivalent position with equivalent benefits, pay, and other terms and conditions of employment.  An employee is entitled to such reinstatement even if the employee has been replaced or his or her position has been restructured to accommodate the employee's absence.").  The court acknowledges there is an argument that King was reinstated to the position she had before her FMLA leave – her expired contract.  However, given the summary judgment standard, the court will draw all inferences in favor of King, the nonmoving party.

[201] *Dalpiaz v. Carbon Cty.*, 760 F.3d 1126, 1132 (10th Cir. 2014) (quoting *Campbell*, 478 F.3d at 1287).

[202] *Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1006–07 (10th Cir. 2011).

burden, the employer is not required to show that the adverse employment decision and the employee's FMLA request are completely and entirely unrelated."[203]

ICG argues the long-contemplated expiration of King's 2018 compensation agreement and shift to a commission-based plan were entirely unrelated to King's FMLA leave.  It points out that the 2018 compensation agreement—signed nearly two years before King requested FMLA leave—was expressly limited to a term of "[twelve] months from the date [] signed by both parties, extendable for an additional [twelve] months subject to satisfactory sales activity."[204]  Additionally, ICG notes, "King was reminded that her agreement would be shifting" well before she requested FMLA leave.[205]  As a matter of both contract and company practice, ICG asserts "the [commission-based agreement] would have taken effect whether King was on FMLA leave or not."[206]

In response, King argues ICG's open-ended assertion that "sales representatives 'typically' stay on a salary-based plan for two years or less[] and 'most' switch to a straight commission plan once their sales revenue hits at least $700,000 annually" evinces "a lack of clear, consistent policies."[207]  She maintains this ambiguity "leav[es] room for ICG to manipulate their terms to their advantage, as they have done with [her]."[208]  But King must come forward with more than speculation or unsubstantiated assertions to rebut ICG's evidence of a

---

[203] *Dalpiaz*, 760 F.3d at 1132.

[204] *See Reply* at 7; *Loach Declaration* at 12.

[205] *Reply* at 7 (citing *Kerekes Declaration*).

[206] *Id.*

[207] *Opposition* at 5 (citing *Motion for Summary Judgment* at 4).

[208] *Id.*

long-contemplated shift to commission-based compensation.[209]  She fails to do so.  Beyond

critiquing the ambiguity of ICG's compensation policy and expressing unfamiliarity with ICG's

two-year "ramp up" period, King does not rebut ICG's evidence showing the 2018 agreement

was set to expire on March 20, 2020.[210]  Nor has King presented any evidence that ICG's

handling of her compensation shift and reinstatement deviated from any stated company policies

or past practices with other employees.

      While FMLA generally requires employers to reinstate employees to their former

position after returning from FMLA leave, an employee's "request for [] FMLA leave does not

shelter her from the obligation . . . to comply with [the employer's] employment policies."[211]

Here, the undisputed record shows King's 2018 compensation agreement expired on March 20,

2020,[212] after which King was expected to move to a new commission-based agreement.[213]

Under these circumstances, the FMLA did not require ICG to turn back the clock on King's

expired agreement.  Rather, ICG could require King to execute a new employment agreement

before returning to work, consistent with existing company policies and practices, as well as

ICG's stated expectations in December 2019 and January 2020—months before King ever

mentioned FMLA leave.

---

[209] *See Bones*, 366 F.3d at 877–78 (concluding a district court properly granted summary judgment for an employer on an FMLA interference claim where the plaintiff "proffer[ed] no evidence, aside from her own speculations," contradicting the employer's stated policy, and therefore "[n]o reasonable juror could deduce . . . that [her] termination was related to her request for an FMLA leave"); *Staggs v. City of Arvada*, No. 19-cv-02802-NYW, 2021 U.S. Dist. LEXIS 20383, at *12–13 (D. Colo. Feb. 3, 2021) (granting summary judgment for an employer, explaining a plaintiff's "conflicting testimony . . . is not enough to refute [] overwhelming evidence" that her termination was not related to her request for FMLA leave).

[210] *See generally Opposition* at 5–6, 8.

[211] *Bones*, 366 F.3d at 878.

[212] *See Loach Declaration* at 12.

[213] *See id.*; *see also Kerekes Declaration* at 31,

In sum, ICG has presented uncontroverted evidence King's compensation shift was not related to her request for FMLA leave.  Accordingly, King's FMLA denial-of-reinstatement theory fails as a matter of law.[214]

As explained, King's lack-of-notice theory survives summary judgment because she has raised a genuine dispute about whether she would have structured her leave differently given proper notice by ICG.  Therefore, ICG's request for summary judgment on King's claim for FMLA interference is GRANTED IN PART and DENIED IN PART, with King's lack-of-notice theory surviving summary judgment.[215]

### b.   FMLA Retaliation

King next claims ICG retaliated against her for requesting and taking FMLA leave by, among other things, "significantly chang[ing] the terms of [her] employment."[216]  ICG counters that summary judgment is appropriate because "King cannot establish a prima facie case of retaliation" or that ICG's reasons for the alleged retaliatory actions are pretextual.[217]

---

[214] *See Gabriel v. Colo. Mt. Med., P.C.*, 628 F. App'x 598, 602 (10th Cir. 2015) (affirming summary judgment for the employer on plaintiff's FMLA interference claim where there was no evidence that the employer's stated lawful reasons for termination were not the real reasons); *Torberson v. BOKF NA*, No. 19-cv-3195-WJM-STV, 2021 U.S. Dist. LEXIS 146590, at *7 (D. Colo. Aug. 5, 2021) ("As Torberson points to no evidence that her exercise of FMLA rights had any bearing on her termination whatsoever, she has failed to create a genuine issue of material fact as to her FMLA interference claim."); *see also Strickland v. Water Works & Sewer Bd.*, 239 F.3d 1199, 1208 (11th Cir. 2001) ("[I]f an employer can show that it refused to reinstate the employee for a reason wholly unrelated to the FMLA leave, the employer is not liable.").

[215] *Cf. Rodriguez-Ortega*, 2023 U.S. Dist. LEXIS 21977, at *39–49 (addressing an employee's lack-of-notice and termination theories separately on a motion to dismiss, electing to grant the employer's request to dismiss the FMLA interference claim as to one theory but not the other); *see also Rosenfeld v. Canon Bus. Sols., Inc.*, No. 09-4127 (JBS/KMW), 2011 U.S. Dist. LEXIS 115415, at *24–33 (D.N.J. Sep. 26, 2011) (granting partial summary judgment on some of the employee's FMLA interference theories but not others); *Pennell v. Judd*, No. 8:19-cv-2433-CEH-TGW, 2022 U.S. Dist. LEXIS 144581, at *19–59 (M.D. Fla. Aug. 12, 2022) (same).

[216] *Amended Complaint* at 3.

[217] *Motion for Summary Judgment* at 27 – 28.

In addition to the FMLA's restriction on employers "interfer[ing] with, restrain[ing], or deny[ing] the exercise of or attempt to exercise" FMLA protected leave,[218] employers are prohibited from retaliating against employees for exercising their rights under the FMLA.[219] FMLA retaliation claims are subject to the burden-shifting analysis under the *McDonnell Douglas* framework.[220]  Under this analysis, King must first establish a prima facie case of retaliation.  "To establish a prima facie case of FMLA retaliation, an employee must prove she: (1) availed herself of a protected right under the FMLA; (2) was adversely affected by an employment decision; and (3) there was a causal connection between the two actions."[221]  If King establishes her prima facie case, the burden then shifts to ICG to "offer a legitimate, non-retaliatory reason for the employment action."[222]  The burden then shifts back to King to demonstrate that the "proffered reason is pretextual."[223]

### i. King provides sufficient evidence to establish a prima facie case of FMLA retaliation.

The court concludes King satisfies the first element of a prima facie case because she availed herself of a protected right under the FMLA when she took medical leave starting on March 10, 2020.  King must then demonstrate that she was adversely affected by an employment decision.[224]

---

[218] 29 U.S.C. § 2615(a)(1).

[219] *See* 29 U.S.C. § 2615(a)(2) (making it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by" the FMLA).

[220] *Metzler*, 464 F.3d at 1180 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)).

[221] *Robert v. Bd. of Cnty. Comm'rs of Brown Cnty.*, 691 F.3d 1211, 1219 (10th Cir. 2012) (quoting *Metzler*, 464 F.3d at 1171).

[222] *Metzler*, 464 F.3d at 1170 (citation omitted).

[223] *Id.* (citation omitted).

[224] *Robert.*, 691 F.3d at 1219 (quoting *Metzler*, 464 F.3d at 1171).

a. **King demonstrates sufficient evidence for a reasonable jury to find two adverse employment actions.**

"In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action."[225] But "a mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action.[226]

King asserts that the following events constitute adverse actions sufficient to sustain her claim for FMLA retaliation: (1) she received two written warnings during her FMLA leave, resulting from what she describes as "pretextual" customer complaints;[227] (2) Loach and another ICG sales representative "collaborated on re-assigning one of [her] Sales Accounts" during her leave;[228] and (3) ICG "significantly changed the terms of [her] employment" and refused to reinstate her unless she agreed to new compensation terms.[229]

As a preliminary matter, "written . . . warning or reprimands are generally not deemed materially adverse employment actions where the record evidence establishes that the employee remains employed and the reprimand has not adversely affected [her]."[230] Though Loach's two written warnings were drafted around the same time he reassigned King's customer accounts, there is no evidence that either warning affected King's employment status on their own accord.

---

[225] *Ford v. Brennan*, No. 2:15-cv-00539-BSJ, 2018 U.S. Dist. LEXIS 244085, at *9 (D. Utah Aug. 27, 2018) (citing *Haynes v. Level 3 Communications, LLC*, 456 F.3d 1215, 1222 (10th Cir. 2006)).

[226] *EEOC v. C.R. England*, 644 F.3d 1028, 1042–43 (10th Cir. 2011).

[227] *Amended Complaint: Causes of Action* at 2.

[228] *Id.* at 3.

[229] *Id.*

[230] *Ford*, 2018 U.S. Dist. LEXIS 244085, at *10 (collecting cases); *see also Payan v. UPS*, 905 F.3d 1162, 1174 (10th Cir. 2018) ("Placement on an employee improvement plan alone does not qualify as a materially adverse action.").

Instead, they appear to be standard warnings containing a brief description of the customer complaints and a corresponding action plan.  Accordingly, the court concludes a jury could not reasonably find that the written warnings, standing alone, constitute a materially adverse employment action.

While some courts have held transferred sales accounts do not constitute a materially adverse employment action where, for example, the employee retains her "salary, rank and title,"[231] the transition of King's customer accounts here posed a financial cost.  As both parties acknowledge, ICG was attempting to transition King to commission-based compensation, receiving approximately ten percent of her annual sales around the same time that her accounts were transferred.[232]  Accordingly, the court concludes a jury could reasonably find that the reassignment of King's customers rises to the level of a materially adverse employment action.

Additionally, the court concludes that a jury could reasonably find that ICG's refusal to reinstate King unless she agreed to new compensation terms qualifies as an adverse employment action given the significant change to King's benefits and compensation under the new structure.

### b.  The adverse employment actions are casually connected to King's FMLA leave.

In establishing the causal connection element of a prima facie case of retaliation, courts have noted "temporal proximity is sufficient to infer a causal relationship between the adverse employment action and protected activity."[233]  However, the Tenth Circuit has "emphasized . . . that a plaintiff may rely on temporal proximity alone only if 'the termination is *very closely*

---

[231] *See Bruno v. Sonalysts, Inc.*, No. 3:01CV1501 (MRK), 2004 U.S. Dist. LEXIS 23848, at *14–16 (D. Conn. Nov. 23, 2004) (concluding an employee's proposed reassignment to less lucrative accounts did not constitute a materially adverse employment action).

[232] *See Kerekes Declaration* at 94–95.

[233] *Yasmeen v. Hospira, Inc.*, No. 2:06-CV-00507 PGC, 2007 U.S. Dist. LEXIS 81476, at *18 (D. Utah Nov. 2, 2007) (citation omitted).

connected in time to the protected activity.'"[234]  Here, King requested FMLA leave on Friday,

March 6, 2020, and started her leave the following Tuesday.  She received her first written

warning from Loach the very next day—March 11, 2020—followed by another one on March

30, 2020, when she was still on leave.[235]  During the same time, Loach permanently reassigned

several of King's customer accounts.[236]  Finally, every time King sought to return from leave,

ICG managers requested she first sign and return her new compensation agreement.[237]  Each of

these adverse employment actions occurred during King's FMLA leave, thereby establishing an

inference of causation.  Accordingly, the court concludes King has established a prima facie case

of FMLA retaliation.

### ii.  ICG offers legitimate, nonretaliatory reasons for the adverse employment actions.

"Having established her prima facie case, the burden . . . then shifts to [ICG] to

demonstrate a legitimate, nonretaliatory reason for" the adverse employment actions.[238]  This is

an "exceedingly light" burden, as the stated reason need only be legitimate and nonretaliatory

"on [its] face."[239]  Here, ICG contends the written warnings and reassignment of King's

customer accounts were prompted by customer complaints about King's responsiveness.[240]  As

for the compensation shift, ICG explains that King's 2018 compensation agreement expired on

March 20, 2020, prompting a shift to a commission-based arrangement, per ICG policies

governing sales representatives' compensation and ICG's stated expectations months before

---

[234] *Metzler*, 464 F.3d at 1171 (quoting *Anderson v. Coors Brewing*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

[235] *Loach Declaration* at 18–19, 23–24.

[236] *Motion for Summary Judgment* at 26 (citing *Loach Declaration* ¶ 25).

[237] *Id.* at 13–14, 16.

[238] *Id.* at 1172 (citation omitted).

[239] *C.R. England*, 644 F.3d at 1043 (quoting *Goodwin v. Gen. Motors Corp.*, 275 F.3d 1005, 1013 (10th Cir. 2002)).

[240] *Motion for Summary Judgment* at 12–13.

King ever mentioned FMLA leave.[241]  Accordingly, ICG has articulated legitimate reasons for the adverse employment actions which are unrelated to King's exercise of her rights under the FMLA.

### iii.   King does not satisfy her evidentiary burden to produce evidence demonstrating ICG's offered reasons are pretextual.

With the first two *McDonnell Douglas* steps satisfied, the burden returns to King to "show that there is a genuine dispute of material fact as to whether [ICG's] reasons . . . are pretextual."[242]  King may meet her burden "by demonstrating such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [ICG's] proffered legitimate reasons for its action[s] that a reasonable factfinder could rationally find them unworthy of credence."[243]  A plaintiff typically makes a showing of pretext by presenting evidence that the defendant's stated reasons for the adverse employment action were false or that the defendant acted contrary to an established company policy or practice.[244]

King's argument that ICG's stated reasons were pretextual largely turns on the temporal proximity between her FMLA leave and the adverse employment actions.  In particular, she notes her "employment contract was drastically changed [] upon her attempted return from FMLA leave, evidencing that her FMLA leave was the 'but-for' cause of the action taken."  "But

---

[241] *Id.* at 14.

[242] *Campbell*, 478 F.3d at 1290 (quoting *Metzler*, 464 F.3d at 1172).

[243] *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014); *see also Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1234 (10th Cir. 2015) ("[The] critical question regarding this aspect of the *McDonnell Douglas* rubric is whether a reasonable factfinder could [] find the employer's rationale unworthy of credence and hence infer that the employer did not act for the asserted non-retaliatory reasons." (internal quotation marks and citation omitted)); *see also Rivera v. City & County of Denver*, 365 F.3d 912, 924–25 (10th Cir. 2004) ("What is at issue is whether the evidence presented to [the decision maker] was so weak that a rational fact finder could infer that the expressed reason for terminating the Plaintiff must have been pretextual.").

[244] *Boska v. Wairfair, LLC*, No. 2:19-cv-00993-JNP-CMR, 2022 U.S. Dist. LEXIS 132979, at *28 (D. Utah July 22, 2022) (citing *Kendrick v. Penske Transp. Servs., Inc.*, 220 F.3d 1220, 1230 (10th Cir. 2000)).

while close temporal proximity can establish causation, it cannot, alone, establish pretext."[245]  In other words, King "must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."[246]  This is where King's retaliation claim falls short.

In the face of significant evidence of customer dissatisfaction with King's performance, King attempts to highlight perceived "inconsistencies in [ICG's] allegations of King's professional conduct."[247]  For example, King points out that mere days before she left on FMLA, Granger Medical, one of the purportedly dissatisfied clients, "entered into a two-year contract with King," sending along an "appreciative email."[248]  Additionally, King contends the "Astro Burger[] account was reassigned . . . due to her inability to attend a meeting on March 6, 2020, the same day she informed ICG of her medical condition."[249]  Though these examples add color to King's performance during the lead up to her FMLA leave, they do not show ICG's reasons were pretextual nor rebut the substantial evidence of customer dissatisfaction with King.

To support an inference of pretext, King "must produce evidence that the employer did more than get it wrong."[250]  Instead, she "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory [or retaliatory] agenda."[251]  In this regard, King's proffered evidence and

---

[245] *Id.* at *29; *see also Metzler*, 464 F.3d at 1172 ("[T]his court has refused to allow even 'very close temporal proximity to operate as a proxy for the evidentiary requirement' that the plaintiff demonstrate pretext." (citation omitted)); *see also Proctor v. United Parcel Serv.*, 502 F.3d 1200, 1213 (10th Cir. 2007) ("Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." (citations omitted)).

[246] *Metzler*, 464 F.3d at 1172 (emphasis in original); *Campbell*, 478 F.3d at 1287.

[247] *Opposition* at 21.

[248] *Id.*

[249] *Id.*

[250] *Johnson v. Weld Cnty.*, 594 F.3d 1202, 1211 (10th Cir. 2010).

[251] *Id.*

assertions miss the mark.  The fact Granger Medical decided to continue working with ICG does not mean it wanted to continue working with King specifically.  On the contrary, Granger Medical's former Director of Marketing expressed deep dissatisfaction with King's "non-responsiveness," which contrasted her experiences with other ICG sales representatives.[252] Given repeated shortfalls with King's performance, the customer contact "called a meeting with [] Loach . . . and demanded [he] reassign a different account representative because [she] would no longer work with [] King."[253]  This aligns closely with Loach's account of the Granger Medical reassignment and the contents of his written warning report.[254]  An earlier email by the Director of Marketing thanking King and a Granger Medical employee "for all [they] ha[d] done"[255] does not reverse the overwhelming evidence that Granger Medical wanted to part ways with King.

As for the remaining accounts, King's argument that customers' frustration was exacerbated by ICG's communication delays after she went on leave does not contradict the evidence that these customers were generally unsatisfied with King's performance.  When considering pretext, the question is not "whether the employer's proffered reasons were wise, fair or correct, but whether it honestly believed those reasons and acted in good faith upon those beliefs."[256]

King's attempt to establish the expiration of her 2018 compensation plan and 2020 compensation shift was a pretext for retaliation similarly fails.  In the face of an agreement

---

[252] *See generally Jones Declaration.*

[253] *Id.* at 2.

[254] *See Loach Declaration* at 16–24.

[255] *See* Dkt. 50-15, *Exhibit 14 to King's Opposition: February 26, 2020 Email.*

[256] *Swackhammer v. Sprint/United Mgmt. Co.*, 493 F.3d 1160, 1169-70 (10th Cir. 2007).

entered into two years earlier and set to expire on March 20, 2020, consistent with ICG's stated practice of a two-year ramp up for new sales representatives, King speculates ICG nevertheless "manipulate[d] [its] terms to [its] advantage."[257]  However, such conclusory speculation "is insufficient to raise a genuine issue of material fact as to pretext."[258]  Beyond her speculation and conclusory assertions concerning ICG's true intentions, King fails to present any evidence suggesting her treatment deviated from any other ICG employees or was driven by a retaliatory purpose.  On the contrary, the commission terms of the new agreement appear to be the same as those contemplated by the 2018 compensation agreement.[259]  Further, the planned shift to commission-based compensation was communicated long before King sought FMLA leave and was even welcomed by King herself during a meeting with Kerekes.[260]  Under these circumstances, the court concludes King has failed to establish a genuine dispute as to any material fact to support her contention that her compensation shift was pretextual.[261]

In sum, King is unable to overcome the legitimate reasons for the reassignment of her customer accounts and shift to commission-based compensation.  Absent competent evidence to support her position that the reasons were a mere pretext for FMLA retaliation, ICG's request for summary judgment on King's FMLA retaliation claim is GRANTED.

---

[257] *See Opposition* at 5.

[258] *Webb v. Level 3 Communications, LLC*, 167 F. App'x 725, 733 (10th Cir. 2006).

[259] *Compare Loach Declaration* at 12 (reflecting King's 2018 compensation agreement, including discussions of her anticipated commission structure), *with Kerekes Declaration* at 94–95 (reflecting the 2020 compensation agreement proposed by ICG).

[260] *See Motion for Summary Judgment* at 10 (citing *2021 King Deposition* at 201:13–17).

[261] *Cf. Litzsinger v. Adams Cnty. Coroner's Off.*, 25 F.4th 1280, 1287-88 (10th Cir. 2022) (affirming summary judgment for employer where employee "present[ed] no circumstantial evidence to show that the [employer's] proffered reason for terminating her was false or unworthy of belief").

## II.   ADA Claims

### a.   Failure to Accommodate

King claims ICG violated the ADA by failing to provide her reasonable accommodations or properly engage with "the interactive process" to determine appropriate accommodations.[262] ICG argues it is entitled to summary judgment because, among other reasons, King's requested accommodations were not reasonable and "she totally abandoned her duty to engage in the interactive process."[263]

The ADA bars an employer from discriminating against a disabled employee by failing to make "reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."[264]  To establish a prima facie failure-to-accommodate claim, an employee must show: (1) she was disabled; (2) she was otherwise qualified to perform the essential functions of her position; (3) she requested a plausibly reasonable accommodation; and (4) her employer refused to accommodate her disability.[265]  "Meeting this test 'is not onerous.'"[266]  If an employee establishes a prima facie claim, the burden then shifts to the employer to present evidence either "conclusively rebutting one or more elements of [the employee's] prima facie case" or "establishing an affirmative defense."[267]  "If the employer presents such evidence, the employee has the burden of coming forward with evidence

---

[262] *See Amended Complaint: Causes of Action* at 3–4.

[263] *Motion for Summary Judgment* at 28–32.

[264] 42 U.S.C. § 12112(b)(5)(A).

[265] *Dansie v. Union Pac. R.R. Co.*, 42 F.4th 1184, 1192 (10th Cir. 2022) (citing *Aubrey v. Koppes*, 975 F.3d 995, 1005 (10th Cir. 2020)).

[266] *Id.* (quoting *Aubrey*, 975 F.3d at 1005).

[267] *Aubrey*, 975 F.3d at 1005 (quoting *Lincoln v. BNSF Ry.*, 900 F.3d 1166, 1204 (10th Cir. 2018)).

concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."[268]

### i. King does not establish a prima facie case for her failure to accommodate claim.

ICG does not dispute whether King was disabled or otherwise qualified to perform the essential functions of her position. Instead, ICG's Motion primarily targets the third element of King's prima facie failure to accommodate claim: whether she requested a plausibly reasonable accommodation.[269]

### a. King requested accommodation.

A request for accommodation "does not have to be in writing, be made by the employee, or formally invoke the magic words 'reasonable accommodation,'" but "it nonetheless must make clear that the employee wants assistance for . . . her disability."[270] "That is, the employer must know of both the disability and the employee's desire for accommodations for that disability."[271] "An employer cannot be liable for failing to accommodate a disability if it is unaware of the need for an accommodation."[272]

Both parties acknowledge King first disclosed her disabilities to Kerekes and Pearce on December 16, 2019.[273] On January 6, 2020, King notes she first requested assistance "with [her] Granger Medical [a]ccount," explaining she was overwhelmed and "need[ed] some help."[274] ICG argues King's general request for help with an "overwhelming" account was not a request

---

[268] *Mason v. Avaya Communs., Inc.*, 357 F.3d 1114, 1122 (10th Cir. 2004) (citing *White*, 45 F.3d at 361).

[269] *Motion for Summary Judgment* at 28–32.

[270] *C.R. England*, 644 F.3d at 1049 (internal quotation marks omitted).

[271] *Id.*

[272] *Aubrey*, 975 F.3d at 1006.

[273] *See Motion for Summary Judgment* at 29; *Opposition* at 23.

[274] *See Amended Complaint: Causes of Action* at 3–4.

for an accommodation.[275]  It points out King never stated she wanted assistance for her

disabilities or asked for an accommodation, even when prompted by Kerekes during the January

2020 meetings.[276]  In any event, ICG notes Kerekes and Pearce repeatedly extended offers for

additional training and support.[277]  When Kerekes asked King "what accommodations [she]

would [] need to be" successful, King responded, "Well, I do feel like . . . I [] have everything I

need," and thanked him for providing additional training opportunities.[278]  In evaluating the

undisputed record, the court concludes no reasonable jury could find these exchanges put ICG on

notice that King sought or needed any accommodations for her disabilities.[279]

During the April 7, 2020 telephone conference, both Loach and Pearce reasserted their

offers to provide King "whatever [she] . . . need[ed] to be successful," such as training or

additional support.[280]  Then, on April 10, 2020, King formally requested, "per [her] Physician's

recommendations," permission to "work from home" during the duration of the COVID-19

pandemic, as well as "occasionally" after the end of the pandemic.[281]  She also asked who would

be available to "print job tickets for [her] once [she's] written them up."[282]  In response, Kerekes

granted King's request to work from home, explaining that "all representatives [were] currently

---

[275] *Motion for Summary Judgment* at 29–30.

[276] *Id.* at 29 (citing *2021 King Deposition* at 28:18–23; *Kerekes Declaration* ¶ 17).

[277] *Id.* at 29–30 (citing *2021 King Deposition* at 28:7–8, 59:4–10, 183:2–8; *Kerekes Declaration* ¶ 18).

[278] *Kerekes Declaration* at 52–53.

[279] *See C.R. England*, 644 F.3d at 1049 ("[B]efore an employer's duty to provide reasonable accommodations—or even to participate in the 'interactive process'—is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice."); *see also Williamson v. Clarke Cnty. Dep't of Human Res.*, 834 F. Supp. 2d 1310, 1321 (S.D. Ala. 2011) (finding as a matter of law that employee's expressions of feeling "overwhelmed" did not place his employer on notice of his need for reasonable accommodations).

[280] *Kerekes Declaration* at 107.

[281] *Id.* at 110.

[282] *Id.*

working from home."[283]  He also noted Pearce was coordinating the assignment of open job tickets to available workers during the pandemic, thereby relieving sales representatives of the need to go to the ICG office.[284]

King's next request for an accommodation was sent via email on April 22, 2020, asking Macfarlane for "someone who [could] assist [her] when . . . [she] experienc[es] symptoms such as joint/muscle aches, sweating excessively, and other significant symptoms."[285]  In the same email, King reiterated her challenge to ICG's decision to reassign her accounts and shift her compensation to full commission.[286]  She noted she had "consulted legal counsel to review the Employment Contract and other documentation" and anticipated hearing back within the next few days.[287]  As noted above, Macfarlane's reply was brief:

> You are on FMLA until June 9, 2020. We previously provided you with a compensation plan. You will need to . . . sign the plan before returning to work. Let us know when you have signed the plan and if and when you intend to return.[288]

He did not address King's request for accommodation and King did not follow-up.[289]

King's final request for accommodation was sent to Kerekes on June 10, 2020, the day she was supposed to return to work.[290]  In her email, she asked for "[four] weeks of FMLA [l]eave as an accommodation effective today," noting her physician could "sign a formal medical certification."[291]  Kerekes responded several days later, explaining King had "exhausted [her

---

[283] *Id.* at 111–12.

[284] *Id.*

[285] *Macfarlane Declaration* at 14.

[286] *Id.*

[287] *Id.*

[288] *Id.* at 16.

[289] *See Motion for Summary Judgment* at 18.

[290] *Kerekes Declaration* at 118.

[291] *Id.*

twelve] weeks of leave under the FMLA for one calendar year [and had] no additional leave time."[292]  However, he noted she may be "entitled to leave under the . . . ADA," but first ICG would "need to know the specific reason(s)" for her requested leave as well as "obtain information from [King] and [her] healthcare provide" as part of the "interactive process."[293] King's lawyer responded the following day, stating they had reached out to King's physician and would "be in touch shortly."[294]  However, ICG maintains they received no further communications from King, her lawyer, or her physician until separating King on grounds of abandonment.[295]  Nevertheless, ICG states it provided King with her requested four weeks of leave and continued to pay her full healthcare premiums until her date of separation.[296]

Based on these undisputed events, the only cognizable accommodation request ICG did not either address or grant—tacitly or otherwise—was King's April 22, 2020 request for help when she experiences certain symptoms.  King maintains Macfarlane's failure to respond to this request—as well as other perceived slights and missteps—vitiated the interactive process and precludes summary judgment for ICG.[297]  ICG counters that King failed to fulfill her own obligations as part of the interactive process, noting she did not provide requested medical records and essentially abandoned her position by late summer.[298]  Because King never actually

---

[292] *Id.* at 121–22.

[293] *Id.*

[294] *Id.* at 125.

[295] *Motion for Summary Judgment* at 18 (citing *2021 King Deposition* at 240:21–241:10, 361:4–7; *Kerekes Declaration* ¶ 41).

[296] *Id.*

[297] *Opposition* at 24–25.

[298] *Motion for Summary Judgment* at 30–32.

returned to work, ICG asserts King cannot show her accommodation request was denied, thereby warranting summary judgment on her ADA claim.[299]

> **b. A reasonable jury could find that ICG did not engage in the interactive process.**

While the interactive process "necessarily var[ies] from situation to situation and no rules of universal application can be articulated, [it] necessarily includes good-faith communications between the employer and the employee."[300]  Both parties "have a responsibility to share relevant information in an attempt to craft a reasonable accommodation."[301]  "Neither party may create or destroy liability by causing a breakdown of the interactive process."[302]

Here, King's April 22, 2020 accommodation request triggered ICG's duty to engage in good faith with her in "an interactive process to determine her limitations and consider whether the accommodations she requested, or perhaps others that might come to light during this interactive process, would enable [her] to return to work."[303]  ICG effectively disregarded King's accommodation request, responding with an ultimatum about her new compensation agreement—sign it and come back to work or stay home.[304]  At the same time, King never followed up on her own request, even when she requested additional FMLA leave as an accommodation several weeks later.

Determining which party is responsible for the breakdown of an interactive process can be particularly difficult where, as here, neither party was proactive.  Under these circumstances,

---

[299] *Id.* at 31.

[300] *Aubrey*, 975 F.3d at 1007 (internal quotation marks, citations, and alterations omitted).

[301] *McFarland v. City & Cnty. of Denver*, 744 F. App'x 583, 587 (10th Cir. 2018).

[302] *Aubrey*, 975 F.3d at 1008–09 (internal quotation marks and citation omitted).

[303] *Id.* at 1007.

[304] *Macfarlane Declaration* at 16.

courts generally look for "signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary."[305]  Actions indicating bad faith can include "obstruct[ing] or delay[ing] the interactive process" and "fail[ing] to communicate, by way of initiation *or response*."[306]  "Several courts have held that when an employer contributes to the breakdown in the interactive process, that contribution will preclude summary judgment for the employer, even if the employee is also blameworthy."[307]  Therefore, courts do not consider "whether [the] defendant was the sole cause, but . . . whether a reasonable juror could conclude from the summary judgment facts that [the] defendant contributed meaningfully to the breakdown in the interactive process."[308]  For the reasons discussed above, the court concludes this is the case here.  A reasonable juror could glean from King and Macfarlane's April 2020 email exchanges that Macfarlane "contributed meaningfully to the breakdown in the interactive process" by failing to address King's request for accommodation.[309]

> ### c.  King has demonstrated that reasonable accommodations could have been made.

But this is not the end of the court's inquiry.  Despite evidence ICG failed to meet its obligation to participate in the interactive process, King "still ha[s] to establish that there [is], in

---

[305] *Beck v. Univ. of Wis. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir. 1996).

[306] *Id.* (emphasis added).

[307] *Norwood v. UPS, Inc.*, No. 19-2496-DDC-JPO, 2021 U.S. Dist. LEXIS 132597, at *30 (D. Kan. July 16, 2021) (collecting cases).

[308] *Id.*

[309] *See, e.g.*, *Dansie*, 42 F.4th at 1194 (10th Cir. 2022) ("Just as an employee may not terminate the interactive process quickly to create liability, so too an employer may not cut off the interactive process so early that the parties cannot find a position to reasonably accommodate the employee."); *Fletcher v. Discover Fin. Servs.*, No. 2:20-cv-00512, 2022 U.S. Dist. LEXIS 155532, at *11–12 (D. Utah Aug. 26, 2022) (noting "[c]ourts have found employers caused the breakdown when, for example, the employer offered a 'take it or leave it' ultimatum or failed to discuss the employee's specific limitations and engage with the employee" (collecting cases)).

fact, a reasonable accommodation that would have enabled her to perform the essential functions of her job, or another job to which [ICG] could have re-assigned her."[310]  In other words, King still has to meet her evidentiary burden of demonstrating a reasonable accommodation could have been made.[311]  However, the Tenth Circuit has cautioned that "an employer's failure to engage in the interactive process will often make it difficult to resolve a case for the employer on summary judgment on this ground."[312]  "And this makes sense.  When an employer does not engage in the interactive process, that employer will unlikely be able to establish the absence of a disputed fact as to the existence of a reasonable accommodation."[313]

Whether a given accommodation is reasonable is a mixed question of law and fact.[314]  "To determine whether an accommodation is reasonable, the Tenth Circuit prescribes another burden-shifting formula."[315]  First, the employee "need only show that an accommodation appears 'reasonable on its face.'"[316]  "The ADA provides that reasonable accommodation 'may include . . . job restructuring, part-time or modified work schedules, reassignment to a vacant

---

[310] *Aubrey*, 975 F.3d at 1009–10; *see also Lincoln*, 900 F.3d at 1207 n.29 ("Our case law is clear that an employee cannot maintain a failure to accommodate claim based solely on an employer's failure to engage in the interactive process." (collecting cases)); *Frazier v. Simmons*, 254 F.3d 1247, 1262 (10th Cir. 2001) ("[T]he employer's failure to interact with the employee does not preclude the employee from losing on summary judgment because the employee must still prove a reasonable accommodation could have been made." (citing *Willis v. Conopco, Inc.*, 108 F.3d 282, 285 (11th Cir. 1997)); *Hennagir v. Utah Dept. of Corrections*, 587 F.3d 1255, 1265 (10th Cir. 2009) ("Even if [an employer] fail[s] to fulfill its interactive obligations to help secure a [reasonable accommodation], [the plaintiff] will not be entitled to recovery unless [s]he can also show that a reasonable accommodation was possible . . .." (quoting *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1174 (10th Cir. 1999))).

[311] *Frazier*, 254 F.3d at 1262; *Stevens v. Rite Aid Corp.*, 851 F.3d 224, 231 (2d Cir. 2017) ("An employee may not recover based on his employer's failure to engage in an interactive process if he cannot show that a reasonable accommodation existed at the time of his dismissal." (quoting *McElwee v. Cnty. of Orange*, 700 F.3d 635, 642 (2d Cir. 2012))).

[312] *Aubrey*, 975 F.3d at 1010 (internal quotation marks and citation omitted).

[313] *Dansie*, 42 F.4th at 1194 n.2.

[314] *Osborne v. Baxter Healthcare Corp.*, 798 F.3d 1260, 1267 (10th Cir. 2015).

[315] *See id.* at 1267–68 (citing *White*, 45 F.3d at 361).

[316] *Aubrey*, 975 F.3d at 1010.

position, acquisition or modification of equipment or devices, . . . and other similar accommodations for individuals with disabilities.'"[317]  However, a proposed accommodation is not reasonable on its face if it would not enable the employee to perform the essential function at issue[318] or if it would require "an employer to reallocate job duties to change the essential functions of a job."[319]

"Second, if the employee presents a facially reasonable accommodation, the burden of production then shifts to the employer to present evidence of its inability to accommodate."[320] "Third, if the employer presents such evidence, the employee has the burden of coming forward with evidence concerning her individual capabilities and suggestions for possible accommodations to rebut the employer's evidence."[321]

In light of the court's obligation to construe King's filings liberally, the court understands King's position to be that she really only needed help "printing job tickets."[322]  She notes she "did not ask ICG to 'hire a second person or assistant,' . . . [or for] sporadic days off whenever she experienced joint pain or excessive sweating."[323]  She also denies ICG offered her a special remote work accommodation, as "all [s]ales [r]epresentatives were" working remotely at the time.[324]  On balance, the record demonstrates "printing job tickets" was one of King's leading

---

[317] 42 U.S.C.A. § 12111(9)(B).

[318] *See* 29 C.F.R. § 1630.2(o)(1)(ii).

[319] *Valdez v. McGill*, 462 F. App'x 814, 818 (10th Cir. 2012).

[320] *Aubrey*, 975 F.3d at 1010 (internal quotation marks and citation omitted).

[321] *Id.*

[322] *Opposition* at 25.

[323] *Id.* at 23–24.

[324] *Opposition* at 12.

concerns after the alleged onset of her disabilities.[325]  And she repeatedly complained about the process to Kerekes, Loach, and Pearce both before and during her FMLA leave.

While "[a]n employer is not required . . . to reallocate job duties in order to change the essential function of a job,"[326] King's request for "assistance with printing job tickets" strikes the court as reasonable on its face.  Because ICG does not outline any of the "essential functions" of King's sales position, and the court must draw all inferences in the light most favorable to King, "printing job tickets" seems to fall outside the range of expected functions for an account manager or sales representative—for example, developing promotional materials, attending meetings, providing customer service, reaching out to prospective customers, and so forth.  And the record suggests ICG outsourced the responsibility of printing job tickets for all sales representatives during the height of the COVID-19 pandemic and was willing to provide additional assistance to King.[327]  Under these circumstances, the court concludes King has at least raised a question of fact as to whether her requested accommodation was reasonable considering the essential functions of her position.

As noted above, "[w]hen an employer does not engage in the interactive process, that employer will unlikely be able to establish the absence of a disputed fact as to the existence of a reasonable accommodation."[328]  Here, ICG challenges King's earlier requests for an assistant or time off depending on her symptoms but does not otherwise address King's request for occasional help printing job tickets.  Therefore, ICG has not satisfied its "burden of production

---

[325] *See 2021 King Declaration* at 21:8–14.

[326] *Milton v. Scrivner, Inc.*, 53 F.3d 1118, 1124-25 (10th Cir. 1995).

[327] *Kerekes Declaration*; *Pearce Declaration* ¶ 6.

[328] *Dansie*, 42 F.4th at 1194 n.2.

. . . to present evidence of its inability to accommodate" King's request,[329] leading the court to conclude there is a genuine dispute over whether reasonable accommodations could have been made.

### d. King does not provide triable evidence to demonstrate ICG refused to accommodate her disability.

Nevertheless, ICG posits another deficiency that entirely defeats King's claim: her failure to demonstrate ICG refused to accommodate her disability[330]—the fourth element of a prima facie case for failure to accommodate under the ADA.[331]  In an argument raised without reference to case law or other authority, ICG maintains because "King *never* returned to work from her FMLA leave, . . . she cannot establish that ICG failed to accommodate [her April 22, 2020] request as it necessitated her return to work as a condition of the accommodation."[332]

The court is doubtful about this line of argument when the employer contributed to breakdowns of the interactive process.[333]  Nevertheless, the court need not address the propriety of ICG's position because King's claim suffers from another fatal defect.  As ICG notes, King was already provided with the only reasonable accommodation she specifies as part of her claim: help with printing job tickets.[334]  It is undisputed that during the COVID-19 pandemic, sales

---

[329] *See Aubrey*, 975 F.3d at 1010.

[330] *Motion for Summary Judgment* at 31.

[331] *Aubrey*, 975 F.3d at 1005.

[332] *Motion for Summary Judgment* at 31.

[333] When taken to its logical conclusion, ICG's position would preclude ADA failure-to-accommodate claims whenever an employer botches the interactive process during an employee's leave, but then terminates the employee before she returns, because the employee could never conclusively prove the employer refused to accommodate. Similarly, it would preclude ADA failure-to-accommodate claims where an employer's failure to engage in the interactive process leaves an employee to believe she would not be able to do the job without the necessary accommodations, and she does not return to work.  ICG's approach would create tension with the mandate that "[n]either party may create or destroy liability by causing a breakdown of the interactive process."  *Albert v. Smith's Food & Drug Ctrs., Inc.*, 356 F.3d 1242, 1253 (10th Cir. 2004).

[334] *Motion for Summary Judgment* at 31–32.

representatives' job tickets were handled by designated ICG employees under Pearce's coordination.[335]  And even before then, ICG managers repeatedly offered King help with her job tickets.[336]  While King rebuffs Pearce, stating at no point during the April 7, 2020 telephone conference, "did Pearce offer to 'write and print sales tickets' for [her]," the call recordings suggest Pearce offered general help with the job ticket process and repeatedly reasserted her offer to help King be successful.[337]  Importantly, King points to no instance in which she requested help printing tickets and that help was not provided.  Based on the evidence presented, the court concludes no reasonable jury could find the "facially reasonable accommodation" King specified was denied.[338]

In sum, the court concludes King has failed to establish a prima facie case for her ADA failure-to-accommodate claim.  While she has raised a genuine dispute about whether ICG meaningfully engaged in the interactive process, she has not pointed to any reasonable accommodations—other than one already granted—that could have resulted from a more productive interactive process.  Accordingly, ICG's request for summary judgment on King's ADA failure to accommodate claim is GRANTED.

---

[335] *See Kerekes Declaration* at 111 (Kerekes' email advising King that during the pandemic, "sales representatives are working remotely at home . . . [ICG] assigned different personnel to handle printing job tickets"); *2021 King Deposition* at 23:1–8.

[336] *Pearce Declaration* ¶ 6; *see also Kerekes Declaration* at 104–05.

[337] *Opposition* at 11.

[338] *See Ratliff v. AT&T Servs.*, No. 20-2483-SAC-GEB, 2022 U.S. Dist. LEXIS 33908, at *22-23 (D. Kan. Feb. 25, 2022) (granting summary judgment for an employer where the plaintiff did not show she was "denied a reasonable accommodation," noting the fact her employer "had not yet granted her request to make home employment permanent [did] not show any denial of a reasonable accommodation").

### b. A reasonable jury could not find King was subjected to harassment based on her disability.

King also asserts a claim for "[u]nlawful [h]arassment" based on her disability, recounting a number of exchanges with ICG managers between December 16, 2019 and January 9, 2020, which left her feeling "humiliated" and "ridiculed."[339]  ICG contends summary judgment is warranted on King's harassment claim because "[n]one of the incidents King alleges in her complaint rise to the level of severe and pervasive harassment."[340]

In the Tenth Circuit, harassment and hostile work environment claims are actionable under the ADA:[341]

> Under Tenth Circuit case law, the elements of an ADA harassment claim are: '(1) the plaintiff is a member of a protected group (i.e., he is 'disabled' as defined by the ADA); (2) the plaintiff was subject to unwelcome harassment; (3) the harassment was based on the alleged disability; and (4) due to the harassment's severity or pervasiveness, the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment.'[342]

Here, King points to six instances of purported harassment between December 11, 2019 and March 5, 2020: (1) Kerekes "ridicul[ing] the Characteristics listed on [her] resume and stat[ing] there was nothing to indicate [she] had a disability;" (2) Kerekes asking if she had depression; (3) Loach "re-assign[ing] one of [her] sales accounts when [she] was having a crippling anxiety attack and was unable to attend a meeting;" (4) Loach "interact[ing] with [her] only twice . . . between December 11, 2019 [and] . . . March 5, 2020;" (5) Kerekes stating his

---

[339] *Amended Complaint: Causes of Action* at 3.

[340] *Motion for Summary Judgment* at 38.

[341] *See Lanman v. Johnson Cnty.*, 393 F.3d 1151, 1155 (10th Cir. 2004); *Callahan v. Commun. Graphics, Inc.*, 657 F. App'x 739, 746–47 (10th Cir. 2016).

[342] *Snow v. Autozoners, LLC*, No. 2:22-cv-00513-JNP-CMR, 2023 U.S. Dist. LEXIS 157990, at *17-18 (D. Utah Sep. 5, 2023) (quoting *Callahan*, 657 F. App'x at 746–47).

wife had King's same mental health condition; and (6) Macfarlane stating he had investigated King's concerns and "found they ha[d] all been addressed and answered fairly."[343]

Even if King satisfied the first element of an ADA claim and received unwelcome harassment, the alleged occurrences do not meet the level of severity or pervasiveness needed to sustain her claim on summary judgment. Indeed, "[a] plaintiff claiming a hostile work environment 'must show that a rational jury could find that the workplace [was] permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'"[344] "General harassment alone is not actionable."[345]

In evaluating the employee's claims of harassment, the court "look[s] to all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."[346] "[A] few isolated incidents of sporadic slurs" do not suffice—rather, "there must be a steady barrage" of harassing conduct.[347] "[I]solated incidents . . . are sufficient to support a hostile work environment claim only when they are 'threating and severe' or 'especially egregious or extreme,'" such as "some kind of physical assault."[348]

---

[343] *Amended Complaint: Causes of Action* at 3.

[344] *Williams v. FedEx Corporate Servs.*, 849 F.3d 889, 897 (10th Cir. 2017) (citation omitted).

[345] *Id.*

[346] *Id.*

[347] *Sidlo v. MillerCoors, LLC*, 718 F. App'x 718, 728 (10th Cir. 2018).

[348] *Brown v. Laferry's LP Gas Co.*, 708 F. App'x 518, 522 (10th Cir. 2017) (internal citation omitted); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)).

In considering the totality of the circumstances, as well as the recordings and transcripts of the calls King calls problematic, the court concludes no reasonable factfinder could find the occurrences King identifies rise to the level of severe and pervasive harassment needed to sustain her claim. First, she did not receive a "steady barrage" of harassing conduct, but rather a handful of comments and actions over the course of three months that left her feeling insulted. None of the listed examples were "threatening and severe" or "especially egregious or extreme." And no reasonable factfinder could find the reassignment of King's sales account had anything to do with her disabilities, which were not disclosed until five days later. As for the perceived cold-shoulder given by Loach between December 2019 and March 2020, the court notes such "shunning" or avoidance does not generally "constitute actionable harassment" under relevant precedent.[349] Accordingly, the court GRANTS ICG's request for summary judgment on King's disability harassment claim.

## III.   Discrimination Claims

Next, the court turns to King's claims ICG unlawfully discriminated against her based on her disability, age, and gender. Because King relies on circumstantial evidence, these claims are each evaluated using the *McDonnell Douglas* burden-shifting framework.[350]

---

[349] *Juarez v. Utah Dep't of Health - Family Dental Plan*, No. 2:05CV0053PGC, 2006 U.S. Dist. LEXIS 69005, at *64 (D. Utah Sep. 11, 2006); *Delesline v. Vilsack*, No. 20-cv-03809-RMR-NRN, 2022 U.S. Dist. LEXIS 211112, at *13 (D. Colo. Nov. 21, 2022) (noting a supervisor's alleged actions, including excluding the plaintiff from meetings, "may have been spiteful and inappropriate, but . . . [did] not amount to severe discriminatory harassment"); *see also Johnson*, 594 F.3d at 1216 (stating "alleged snubs" including supervisors giving the plaintiff the "'cold shoulder,'" sitting farther away from her at meetings, being too busy to answer her questions, and generally trying to avoid her were insufficient to support a claim of retaliation).

[350] The *McDonnell Douglas* burden-shifting framework applies to claims under the ADA, *see Dewitt v. Southwestern Bell Tel. Co.*, 845 F.3d 1299, 1306 (10th Cir. 2017), ADEA, *see Jones v. Oklahoma City Pub. Sch.*, 617 F.3d 1273, 1279 (10th Cir. 2010), and Title VII, *see Turner v. Pub. Serv. Co.*, 563 F.3d 1136, 1142 (10th Cir. 2009). *See also Riser v. QEP Energy*, 776 F.3d 1191, 1199–200 (10th Cir. 2015) (explaining "[w]here a plaintiff seeks to use circumstantial evidence to show discriminatory intent, the [*McDonnell Douglas*] burden-shifting framework . . . applies").

As discussed regarding King's FMLA retaliation claim, the *McDonnell Douglas* framework consists of three steps.  First, the employee must provide evidence supporting a prima facie discrimination claim.[351]  The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for its decision."[352]  During these first two steps, "[t]he burden on the employee to establish a prima facie case is light, as is the burden on the employer to come back with a legitimate nondiscriminatory reason."[353] Finally, at the third stage, "the ball returns to the plaintiff who must show the employer's stated reasons are pretextual."[354]

    **a.  Summary judgment is warranted for ICG on King's disability discrimination claim.**

The ADA prohibits employers from discriminating against "a qualified individual on the basis of disability."[355]  "To establish a prima facie case of discrimination under the ADA, an employee must show: (1) she is disabled within the meaning of the ADA; (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired; and (3) she was discriminated against because of her disability."[356]  As with other discrimination claims, establishing a prima facie case of disability discrimination is "not onerous."[357]

ICG challenges the third element of King's prima facie case of disability discrimination, noting it is unclear what "specific adverse employment actions [King alleges she] suffered

---

[351] *Rivera*, 365 F.3d at 920.

[352] *McDonnell Douglas Corp.*, 411 U.S at 802.

[353] *Guy v. McDonough*, No. 20-6158, 2021 U.S. App. LEXIS 26140, at *5 (10th Cir. Aug. 30, 2021) (internal citations omitted).

[354] *Barrett v. Salt Lake Cnty.*, 754 F.3d 864, 867 (10th Cir. 2014).

[355] 42 U.S.C. § 12112(a).

[356] *Mason*, 357 F.3d at 1118 (10th Cir. 2004).

[357] *Hawkins v. Schwan's Home Serv., Inc.*, 778 F.3d 877, 883 (10th Cir. 2015) (quoting *Plotke v. White*, 405 F.3d 1092, 1099 (10th Cir. 2005)).

because of her disability."[358]  In her Complaint, King states she "felt humiliated" when Kerekes cross-referenced her resume and remarked there were no signs of any disability.[359]  Though inartful, Kerekes' off-hand comment during a meeting requested by King does not constitute an adverse employment action.[360]  The sole employment action King specifically ties to her disability discrimination claim is when "Loach re-assigned one of [her] sales accounts when [she] was having a crippling anxiety attack and was unable to attend a meeting."[361]

King fails to show how Loach's reassignment of the customer account was prompted by her disability.  Indeed, as the parties both acknowledge, King did not even disclose her disabilities to ICG until a few days after Loach reassigned her customer account.[362]  In any event, Loach made clear he only reassigned the account because the customer was "furious" King did not have his order ready, failed to answer his calls, and did not show up to their scheduled meeting.  Faced with a dissatisfied customer and an upcoming international flight, Loach made the "heat of battle" decision to reassign King's account to another sales representative.[363]  The fact King was having an anxiety attack at the time the decision was made, especially since Loach was unaware of King's disability, does not make Loach's business decision discriminatory.

But even if King could make out a prima facie case of disability discrimination, she fails to present any evidence Loach's proffered reasons for transferring King's account were

---

[358] *Motion for Summary Judgment* at 33.

[359] *See Amended Complaint: Causes of Action* at 3.

[360] *Cf.  Hillig*, 381 F.3d at 1032–33 (explaining the threshold for an adverse employment action for the purposes of establishing a prima facie claim under Title VII).

[361] *Amended Complaint: Causes of Action* at 3.

[362] *See Motion for Summary Judgment* at 29; *Opposition* at 23.

[363] *See Loach Declaration* ¶ 19; *Kerekes Declaration* at 44–48.

pretextual.  Though she denies she was at fault for the customer's untimely order, King acknowledges she did not answer the customer's phone calls and failed to show up at their scheduled meeting.[364]  Loach was left to deal with the fallout, and the court will not "second guess [his] business judgment."[365]  King fails to carry her burden of identifying evidence that could support a reasonable jury's finding Loach's asserted justification was pretextual. Therefore, the court GRANTS summary judgment for ICG on the issue of disability discrimination.

### b. Summary judgment is warranted for ICG on King's age discrimination claim.

King asserts ICG discriminated against her on the basis of age,[366] which is prohibited by the Age Discrimination in Employment Act (ADEA).[367]  In particular, King notes two current or former ICG employees—J.M., who "she believe[s] is younger than [her]," and M.B., of whose age she is "unsure"—received a higher starting salary. "To state a prima facie case for discriminatory compensation under the ADEA, a plaintiff must show (1) [s]he is a member of a protected class, *i.e.*, over [forty] years of age and (2) [s]he performed similar work to younger employees who received greater compensation."[368]

Here, King was undisputedly over forty years of age during the relevant period, thus establishing the first element.[369]  As for the second element, King has not definitively alleged

---

[364] *See 2021 King Deposition* at 157:14–17, 158:14–16.

[365] *Mason*, 357 F.3d at 1119.

[366] *See Amended Complaint: Causes of Action* at 4–5.

[367] 29 U.S.C. § 623(a)(1) (making it unlawful for any employer to "fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age").

[368] *Cloud v. Wormuth*, No. 20-cv-4-EFM, 2023 U.S. Dist. LEXIS 127919, at *18 (E.D. Okla. July 24, 2023) (citing *Daniels v. UPS, Inc.*, 701 F.3d 620, 636 (10th Cir. 2012)).

[369] *See 2021 King Deposition* at 6:6–7.

J.M. and M.B. are younger than her.  Nor has she proffered any evidence they performed similar work to her or received greater compensation beyond unsubstantiated allegations.[370]  ICG counters with Loach's competent testimony that J.M. held a completely different position than King—Vice President of Technology—whereas M.B. was hired with additional responsibilities to enter and develop the Denver market, as well as "create[e], develop[], and maintain[] ICG's first social media presence."[371]  Of the three other sales representatives with whom King actually worked, ICG notes "she was the youngest."[372]  Under these circumstances, King fails to proffer evidence to establish a prima facie case of discriminatory compensation under the ADEA.

As noted above, King's sole basis for her age discrimination claim is the alleged pay disparity with J.M. and M.B.  She provides no other evidence of discriminatory remarks or actions by ICG based on her age.  Accordingly, ICG's request for summary judgment on King's age discrimination claim is GRANTED.

### c.   Summary judgment is warranted for ICG on King's gender discrimination claim.

King asserts ICG discriminated against her on the basis of her gender.  To make a prima facie case under the *McDonnell Douglas* framework, King must establish "(1) she is a member of a protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position at issue; and (4) she was treated less favorably than others not in the protected class."[373]

---

[370] *See Amended Complaint: Causes of Action* at 3–5; *Opposition* at 27–28.  King asserts all three employees performed similar work because J.M. and M.B. also sold the company's product and services.  *Opposition* at 29. However, this does not account for their additional responsibilities above and beyond King's.

[371] *Motion for Summary Judgment* at 34–35; *Reply* at 14–15.

[372] *Motion for Summary Judgment* at 34.

[373] *Piercy v. Maketa*, 480 F.3d 1192, 1203 (10th Cir. 1998).

King asserts ICG discriminated against her on the basis of her gender because "her compensation agreement's terms were inferior to her male counterparts."[374]  King again points to the same two male counterparts – J.M. and M.B. – as being similarly situated.[375]  Employees are considered similarly situated when "they (1) have dealt with the same supervisor; (2) were subjected to the same work standards; and (3) had engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."[376]  A court also compares the relevant employment circumstances to determine if two employees are similarly situated.[377]  Both J.M and M.B. had job responsibilities that varied dramatically from King's.[378]  And King does not show J.M. and M.B. engaged in the same conduct as King but received disparate treatment from ICG. Therefore, King does not meet her burden to provide evidence that establishes a prima facie case of gender discrimination, and the court GRANTS ICG's request for summary judgment on King's gender discrimination claim.

---

[374] *Opposition* at 28.  King also asserts ICG discriminated against her on the basis of her gender because "she was the sole female representative who was not a shareholder."  *Id.*  ICG does not refute that King was the only female sales representative who was not a shareholder.  Dkt. 16, *Answer to Amended Complaint* at 7.  However, this does not demonstrate gender discrimination, since all the other women sales representatives were shareholders, indicating King was not excluded because of her gender.  As a result, the court does not address this portion of King's claim.

[375] *Opposition* at 29.

[376] *MacKenzie v. Denver*, 414 F.3d 1266, 1277 (10th Cir. 2005).

[377] *Aramburu v. The Boeing Company*, 112 F.3d 1398, 1404 (10th Cir. 1997).

[378] *Motion for Summary Judgment* at 34–35; *Reply* at 14–15.

IV.     **Retaliation Claims**

Finally, the court turns to King's claim ICG unlawfully retaliated against her based on her disability, age, and gender.  Because King relies on circumstantial evidence, these claims are each evaluated using the familiar three-step *McDonnell Douglas* burden-shifting framework.[379]

     a.  **King provides sufficient evidence that a reasonable jury could find a prima facie case of retaliation.**

At the first step, King must establish a prima facie case of retaliation by providing "evidence of three things – that [s]he engaged in protected activity, that [s]he suffered an adverse employment action, and that a close causal link exists between the two."[380]  Both ICG and King agree she engaged in protected activity when: (1) she submitted a letter on December 16, 2020 alleging she had been discriminated against on the basis of her age, gender, and disability; (2) she requested FMLA leave on March 6, 2020; (3) she requested an accommodation to work from home on April 7, 2020; (4) she sent Macfarlane a written complaint alleging she had been harassed and discriminated against on April 16, 2020; (5) she requested an accommodation for assistance with print tickets on April 22, 2020; (6) she filed a complaint with the U.S. Department of Labor Wage and Hour Division on April 28, 2020; (7) she filed a complaint with the Utah Antidiscrimination and Labor Division (UALD) on May 29, 2020; and (8) she requested an additional four weeks of FMLA leave on June 10, 2020.[381]

---

[379] The *McDonnell Douglas* burden-shifting framework applies to claims under the ADA, *see Dewitt*, 845 F.3d at 1306, ADEA, *see Jones*, 617 F.3d at 1279, and Title VII, *see Turner*, 563 F.3d at 1142.  *See also Riser*, 776 F.3d at 1199–200 (explaining "[w]here a plaintiff seeks to use circumstantial evidence to show discriminatory intent, the [*McDonnell Douglas*] burden-shifting framework . . . applies).

[380] *Barrett*, 754 F.3d at 867-68.

[381] *See Motion for Summary Judgment* at 39; *Opposition* at 31.

"In general, only acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits will rise to the level of an adverse employment action."[382]  But "a mere inconvenience or an alteration of job responsibilities" does not constitute an adverse employment action.[383]  King asserts the following events constitute adverse actions sufficient to sustain her claim for age, gender, and disability retaliation: (1) Loach's two written warnings; (2) the permanent reassignment of her customer accounts; and (3) ICG's refusal to reinstate her unless she agreed to new compensation terms.

These are the same adverse actions King advances for her FMLA retaliation claim.  The court concludes, for the reasons previously articulated,[384] the court finds that a reasonable jury could not find that written warnings constitute a materially adverse employment action but could find that the reassignment of King's customer accounts and ICG's refusal to reinstate King unless she agreed to new compensation terms qualify as materially adverse employment actions.

In establishing the third element of a prima facie case of retaliation, courts have noted "temporal proximity is sufficient to infer a causal relationship between the adverse employment action and protected activity."[385]  However, the Tenth Circuit has "emphasized . . . that a plaintiff may rely on temporal proximity alone only if 'the termination is *very closely* connected in time to the protected activity.'"[386]  ICG acknowledge a number of protected activities occurred in close proximity with the reassignment of King's accounts and ICG's requests that

---

[382] *Ford*, 2018 U.S. Dist. LEXIS 244085, at *9 (citing *Haynes*, 456 F.3d at 1222).

[383] *C.R. England*, 644 F.3d at 1042–43.

[384] *See supra* Section I(b)(i)(a) (discussing King's provision of sufficient evidence for a reasonable jury to find two adverse employment actions).

[385] *Yasmeen*, 2007 U.S. Dist. LEXIS 81476, at *18 (citation omitted).

[386] *Metzler*, 464 F.3d at 1171 (quoting *Anderson*, 181 F.3d at 1179) (emphasis in original).

she sign a new compensation agreement.[387]  For example, King started her FMLA leave on March 10, 2020.[388]  She received her first written warning from Loach the very next day— March 11, 2020—followed by another one on March 30, 2020, when she was still on leave.[389] Around the same time, Loach permanently reassigned several of King's customer accounts.[390] Finally, every time King sought to return from leave, she was confronted by ICG managers' requests that she first sign and return her new compensation agreement.[391]  Because "[t]he burden on the employee to establish a prima facie case is light," the court concludes King has sufficiently established a prima facie case of age, gender, and disability retaliation.[392]

### b.  King does not satisfy her burden to provide evidence demonstrating ICG's offered reasons are pretextual.

Assuming King has established a prima facie case, she does not meet her burden to provide evidence that demonstrates a genuine issue for trial on pretext.  ICG contends customer complaints about King's responsiveness directly led to the written warnings and reassignment of King's customer accounts.[393]  As for the compensation shift, ICG explains King's 2018 compensation agreement expired on March 20, 2020, and ICG policy dictates a shift to a commission-based arrangement after two years.[394]  Accordingly, ICG has articulated legitimate, nonretaliatory reasons for the adverse employment actions which are unrelated to King's age, gender, or disability.

---

[387] *See Motion for Summary Judgment* at 39.

[388] *Motion for Summary Judgment* at 12 (citing *2023 King Deposition* at 78:22–25; *2021 King Deposition* at 130:15–18; *Kerekes Declaration* ¶ 28).

[389] *Loach Declaration* at 18–19.

[390] *Motion for Summary Judgment* at 26 (citing *Loach Declaration* ¶ 25).

[391] *Id.* at 13–14, 16.

[392] *Guy*, 2021 U.S. App. LEXIS 26140, at *5 (internal citations omitted).

[393] *Motion for Summary Judgment* at 12–13.

[394] *Id.* at 14.

King must then present evidence demonstrating ICG's "retaliatory motive."[395]  As explained above, "[a] plaintiff can show pretext by revealing weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions such that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reason."[396]  A plaintiff typically makes a showing of pretext by presenting evidence that the defendant's stated reasons for the adverse employment action were false or that the defendant acted contrary to an established company policy or practice.[397]

King argues "the timing and nature of the employment actions" creates "substantial reason to question the authenticity of ICG's justifications."[398]  "But while close temporal proximity can establish causation, it cannot, alone, establish pretext."[399]  In other words, King "must . . . present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."[400]

Beyond critiquing the timing, King highlights perceived "contradictions" in ICG's evidence of customer dissatisfaction.[401]  She argues the customer dissatisfaction is borne out of circumstances beyond her control.  For example, King argues an error on Atlantis Burger's

---

[395] *Metzler*, 464 F.3d at 1172.

[396] *Frappied v. Affinity Gaming Black Hawk, L.L.C.*, 966 F.3d 1038, 1059 (10th Cir. 2020) (quoting *Garrett v. Hewlett-Packard Co.*, 305 F.3d 1210, 1217 (10th Cir. 2002)).

[397] *Boska*, 2022 U.S. Dist. LEXIS 132979, at *28 (citing *Kendrick*, 220 F.3d at 1230).

[398] *Opposition* at 32.

[399] *Boska*, 2022 U.S. Dist. LEXIS 132979, at *29; *see also Metzler*, 464 F.3d at 1172 ("[T]his court has refused to allow even 'very close temporal proximity to operate as a proxy for the evidentiary requirement' that the plaintiff demonstrate pretext." (citation omitted)); *see also Proctor*, 502 F.3d at 1213 ("Although we may consider evidence of temporal proximity—typically used to establish a prima facie case—in analyzing pretext, temporal proximity alone is insufficient to raise a genuine issue of material fact concerning pretext." (citations omitted)).

[400] *Metzler*, 464 F.3d at 1172 (emphasis in original); *Campbell*, 478 F.3d at 1287.

[401] *Opposition* at 21.

account was caused by another sales representative.[402]  However, she never presents evidence to disprove the crux of the customer complaint: "the lack of response to her repeated request to speak to [King]."[403]  King fails to rebut ICG's overwhelming documentation of customer dissatisfaction with King.

King's attempt to establish that the expiration of her 2018 compensation plan and 2020 compensation shift was a pretext for retaliation similarly fails.  King argues ICG's "inconsistent" company policies provide room for ICG to manipulate the policies' terms.[404]  However, she cannot simply offer speculation to support her allegations.  She "must come forward with evidence that the employer didn't really believe its proffered reasons for action and thus may have been pursuing a hidden discriminatory [or retaliatory] agenda."[405]  Beyond her speculation and conclusory assertions as to ICG's true intentions, King fails to present any evidence suggesting her treatment deviated from other ICG employees.  Under these circumstances, the court concludes no reasonable factfinder could find the stated reasons for her compensation shift were pretextual.[406]

In sum, King is unable to overcome the legitimate reasons ICG offers for the reassignment of her customer accounts and shift to commission-based compensation.  Absent any evidence to support her position that ICG's reasons were a mere pretext for retaliation on the

---

[402] *Opposition* at 10.

[403] *Loach Declaration* at 21.

[404] *Opposition* at 32.

[405] *Johnson*, 594 F.3d at 1211.

[406] *Cf. Litzsinger*, 25 F.4th at 1287-88 (affirming summary judgment for employer where employee "present[ed] no circumstantial evidence to show that the [employer's] proffered reason for terminating her was false or unworthy of belief").

basis of her age, gender, and disability, ICG's request for summary judgment on King's age, gender, and disability retaliation claim is GRANTED.

**CONCLUSION**

For the aforementioned reasons, ICG's Motion for Summary Judgment[407] is GRANTED IN PART and DENIED IN PART.  Save only for King's FMLA lack-of-notice claim, ICG's Motion is granted in its entirety.  All of King's other claims are dismissed.

The court will hold a status and scheduling conference on Wednesday, January 3, 2024 at 1:30 pm to schedule a trial on the remaining claim.

SO ORDERED this 8th day of November, 2023.

BY THE COURT:

_____
ROBERT J. SHELBY
United States Chief District Judge

---

[407] Dkt. 46.